(No. 39778.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* JOHN EDWIN MYERS, Appellant.

*Opinion filed September 23 ,1966.*

312

MARVIN GOLDENHERSH, of East St. Louis and RICHARD DEGEN, of Belleville, for appellant.

WILLIAM C. CLARK, Attorney General, of Springfield, and JOHN M. KARNS, JR., State's Attorney, of Belleville, (FRED G. LEACH, Assistant Attorney General, and JOHN F. O'CONNELL, Assistant State's Attorney, of counsel,) for the People.

PER CURIAM: A jury in the circuit court of St. Clair County found John Edwin Myers guilty of the murder of Carole Ballard and fixed the penalty at death. The court sentenced him to death and he appeals directly to this court.

Mrs. George Ballard testified that about 6 o'clock P.M. on August 30, 1961, her husband George, and their ten-year-old daughter, Carole, went fishing at Emge Lake on Route 460 in St. Clair County. She expected them home about 7 o'clock so that her husband could take some medicine, but they did not return. About 8 o'clock she and her

son walked to the lake, which is approximately a mile from their home, and found her husband's automobile. She could not locate her husband and daughter. She called the Belleville police and about 11 o'clock that evening they reported that they had found her husband dead.

Harold Harrison and Harry Greenfield, deputy sheriffs of St. Clair County, testified that they found the body of Ballard. He was lying on his left side, his hands were tied behind his back with a white plastic clothesline. He had been shot in the back of the head.

Robert Borutta and Norman Simonin, Illinois State Police officers, testified that about 3:30 A.M. on August 31 they found the body of Carole Ballard. Her hands had been tied behind her back and a cloth tied across her mouth. She had been shot in the forehead. Clifford C. Kane, a physician and the St. Clair County coroner, testified that Carole Ballard died as a result of a gunshot wound in the head.

H. P. Graham testified that in the evening of August 30, 1961, a man, whom he identified as the defendant, and a girl came to his house. Defendant had a gun and demanded food. He robbed him of money and took his car and Margaret Wernicke, a member of the Graham household, as a hostage.

Defendant's confession which was admitted into evidence, after a preliminary hearing on its voluntariness, is long and detailed. In it he tells of his acquaintance with Donna Marie Stone, who was 13 years old at the time of the crime. He said that she had stolen a Bearcat Ruger .22 pistol from her uncle Leroy Sparks. He said that he was with her in August, 1961, while she was visiting her grandparents in Edwardsville. He was unemployed and was going to leave for St. Louis to look for work. She insisted on going with him and they started walking to St. Louis. They walked until evening and slept that night in a box car. The next day they walked until they got to the outskirts of Belleville where they spent the night at Emge Lake. After telling what they did that day he said, "Some time in the

afternoon, around four or five o'clock, there was a man and a girl, and another man fishing in the lake. We sat at our camp and drank coffee. After the one man left, we walked part way around the lake. I told Donna to wait and I would go get the man and the girl. We had decided that I would bring them back and we would rob them and steal their car. I walked up to the man and the girl. They were just getting ready to leave. The man gave me a cigarette. I asked him if he caught any fish. It was getting dark. I reached in my pocket and pulled the gun. I told them to walk on back down the lake. When we got back to where Donna was, I told her to tie the man up. She had the rope with her. The man said don't hurt the little girl and I told him I wouldn't. When we tied up the man, the little girl started to cry. Donna tied his hands. I then gave her the gun and I tied the man's feet. I searched the man and took his wallet and his car keys. I knocked the man out by hitting him in the head with the gun. We then took the little girl back towards the railroad track thirty or forty feet. Donna had tied the girl's hands behind her back. I tied a handkerchief over her mouth. The little girl was crying again. I made the little girl sit in the weeds. I remember shooting the little girl in the forehead and the man in the back of the head, but I do not remember which one I shot first. We went over and tried to start the man's car. We could not get it started and I panicked. I even cut the wires on the ignition and tried to start the car." He then told in detail of going to Graham's farm house, stealing his car and taking Margaret (Wernicke) as a hostage.

Defendant first argues that his confession should not have been admitted into evidence. The record shows that he and Donna Marie Stone were apprehended about 2:00 o'clock A.M. on September 2, 1961, in Midland, Texas. About 6:00 o'clock that evening he made a confession to the Texas authorities and shortly after noon on the next day he made a confession to the Illinois authorities who had

gone to Texas to question him. He filed a motion to suppress the use of either confession in evidence. After a hearing on the motion, it was overruled as to the confession given to the Illinois authorities and that confession was admitted. He argues that the confession given to the Texas authorities was coerced and, therefore, the subsequent confession given to the Illinois authorities should be held to be involuntary.

During the hearing on his motion to suppress, defendant testified that after he had been taken into custody, his outergarments were taken from him and he wore only a thin pair of pants and a shirt. He said that except for short periods of questioning by the police, he was kept in the drunk tank from 2:00 o'clock A.M. until 6:00 o'clock P.M. where the temperature was 45 degrees. He stated that he was never advised of his constitutional rights and on three different occasions he requested counsel, which requests were denied. He said that while he was being questioned, Donna Marie Stone was brought where he could see her crying and that parts of the statement taken from her were read to him, but that he was not allowed to see the statement. He also said that he did not have anything to eat and did not sleep from 2:00 o'clock A.M. until he confessed at 6:00 o'clock P.M. The next afternoon he said the Illinois authorities appeared and identified themselves. He stated that they did not advise him of his right to remain silent or his right to counsel but he admitted they advised him that any statement he made might be used against him. He then gave them a statement.

On cross-examination, defendant stated that he was never threatened, beaten or promised leniency by the Texas authorities. He said he knew he had a right to remain silent and refused to answer questions by the Texas authorities the first two times he was questioned. When he was asked if it was not a fact that he signed both confessions, he re-

plied, "I got tired of being questioned and I signed the statements."

The confession given to the Texas authorities was not introduced into evidence nor did these authorities testify at the hearing on the motion to suppress. Robert Miskell, deputy sheriff of St. Clair County, Julius Luber, a member of the crime section of the Illinois State Police, and Maurice Joseph, chief deputy sheriff of St. Clair County, testified that they questioned defendant at the court house in Midland, Texas, shortly after noon on September 3, 1961. Their testimony indicates that the room where they questioned defendant was clean, light and ventilated. Defendant was clean and was dressed in denim slacks and a T-shirt. They said that they identified themselves and stated their purpose for being there. Defendant appeared to them to be calm, co-operative and not afraid. They testified that he did not complain of being cold, not fed, not allowed to sleep or any other mistreatment by the Texas authorities, but on the contrary had said he was not mistreated by the Texas authorities. The Illinois authorities knew of the prior confession, but they had not seen it. They said they advised defendant of his right to counsel which he refused. The officers said there was no interrogation and that defendant just began giving the statement in narrative and that it was taken in longhand. While the statement was being typed, they said defendant was taken to his cell for lunch. Thereafter the statement was given to him to read but he declined to do so without giving any reason for refusing. Deputy Miskell testified that "He [the defendant] said 'You read it to me', or words to that effect." It was then read to him, one page at a time, and he signed each page.

Defendant relies heavily on *Leyra* v. *Denno,* 347 U.S. 556, 74 S. Ct. 716, 98 L. Ed. 948, where defendant, in a series of confessions, admitted murdering his parents. In that case Leyra was questioned by the police from sometime

after 3 P.M. until 11 P.M. on Tuesday, from 10 A.M. until midnight on Wednesday and from 9 A.M. Thursday until about 8:30 A.M. on Friday when he was taken to his parents funeral. After the funeral he was allowed an hour and a half sleep. When the interrogation resumed, a microphone was placed in the room and Leyra, who was suffering from a severe sinus attack, was introduced to a Doctor Helfand, ostensibly for the purpose of treating his sinus trouble. Doctor Helfand, however, was a State employed psychiatrist skilled in hypnosis. For an hour and a half the techniques of a highly trained psychiatrist were used to break the will of Leyra who was already physically and emotionally exhausted. The doctor also made threats and promises of leniency, and Leyra, in a dazed condition, finally began to accept the psychiatrist's suggestions that he murdered his parents. The police then came into the room and took a confession. In holding the subsequent confessions involuntary the court stated, "All were simply parts of one continuous process. All were extracted in the same place within a period of about five hours as the climax of days and nights of intermittent, intensive police questioning. First, an already physically and emotionally exhausted suspect's ability to resist interrogation was broken to almost trance-like submission by use of the arts of a highly skilled psychiatrist. Then the confession petitioner began making to the psychiatrist was filled in and perfected by additional statements given in rapid succession to a police officer, a trusted friend and two state prosecutors." 347 U.S. 556, 561, 74 S. Ct. 716, 719, 98 L. Ed. 948, 952.

This case is a far cry from the *Leyra* case. Defendant admits that neither the Texas nor the Illinois authorities beat him, threatened him, or made promises of leniency. He testified that he was not fed and did not sleep from 2 A.M. until 6 P.M., but it is not clear whether the Texas authorities did not feed him or permit him to sleep or whether this was a matter of his own choice. It is also un-

clear how much of the time between the time he was taken in custody at 2 A.M. and the time that he confessed at 6 P.M. was spent in the drunk tank where he complained of being cold and how much was spent in the interrogation room with the Texas authorities. At any rate defendant testified that he signed the statement given to the Texas authorities because he was tired of being questioned and not because of any mistreatment. It is clear that after he made his statement to the Texas authorities at 6 P.M. he was fed and permitted to sleep and was not brought before the Illinois authorities until after noon of the next day. At this time, even according to his own testimony, he freely and cooperatively made a long detailed statement of the events leading up to, and including, the murder of the Ballard girl and her father.

Defendant further argues that the confession should not have been admitted under the holding of *Escobedo* v. *Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977, because he says his three requests for counsel to the Texas authorities were each denied and because the Illinois authorities did not advise him of his right to counsel. The confession made to the Texas authorities was not admitted in this cause, and the Illinois authorities testified that they afforded defendant an opportunity to be represented by an attorney. In any event, the Supreme Court in *Johnson* v. *New Jersey,* 385 U.S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882, has ruled that the Escobedo holding and the guide lines of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, are not to be applied retroactively. In the number of cases announced this term we abided by our former decisions before *Miranda* and *Johnson* in trials commenced in this State prior to June 22, 1964, and June 13, 1966, the dates those decisions were announced, respectively. These cases ares *People* v. *Jackson,* 35 Ill.2d 162, *People* v. *Thomas,* No. 38464, *People* v. *Heise,* No. 38678, *People* v. *Ostrand,* No. 39066, *People* v. *Le May,* 35 Ill.2d 208, *People* v. *Wallace,*

No. 39288, *People* v. *Williams,* Nos. 39515, 39524, cons. and *People* v. *McGuire,* No. 39531.

We are fully aware of the potential problems inherent in the admission of a confession after a prior confession has been made. However, we have carefully considered the evidence with reference to the Texas confession, which consisted solely of the testimony of the defendant, and conclude that it was not taken under circumstances which would necessitate the holding of involuntariness in the confession to the Illinois authorities.

The question of the admissibility of a confession is for the trial court to decide and on review his decision will not be disturbed unless manifestly erroneous. (*People* v. *Wilson,* 29 Ill.2d 82.) We hold that the trial court was clearly justified in holding the confession given to the Illinois authorities a voluntary confession. *Lyons* v. *Oklahoma,* 322 U.S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481.

It is next argued that the manifest weight of the evidence supports defendant's affirmative defense that he was insane at the time of the crime. He argues that the evidence shows that he is a severely ill sociopath, who at the time of the murder was experiencing a psychotic episode. Five medical witnesses testified on this issue—two for the defense and three for the prosecution.

Ben C. England, Jr., a clinical psychologist and chief psychologist at Rusk State Hospital, Rusk, Texas, testified for the defense. His duties at the State Hospital are primarily the evaluation and treatment of patients committed there for the purpose of treatment, release and transfer to other institutions. He stated that he had five or six interviews with the defendant and administered the Welchsler Bellevue Intelligence Scale test, a Bendergestalt test, a Rorschach Ink Blot test, a Minnesota Multaphasic Personality Inventory and a Zondie. He stated that defendant has an I.Q. of 109, but is an impulsive person. His test as to organic brain damage was negative and his test for organic

injury or disease was also negative. He felt that defendant was capable of developing acute psychotic episodes, that he would probably get worse, and that he could probably make a reasonable institutional adjustment. In response to a hypothetical question containing the facts alleged by the prosecution, he testified that it was his opinion that when defendant committed the crime, he was suffering from an overt psychotic episode which he described as being of the ambulatory schizophrenic type; that he was not able to control himself; that he was not capable of distinguishing right from wrong, and that he was not capable of choosing to do or not to do the act.

Charles W. Folsom, a medical doctor specializing in psychiatry and a director of the maximum security unit of the State hospitals in Texas, also testified for the defense. Doctor Folsom stated that he hypnotized defendant with his consent and stated he discovered a great deal about the way he thinks. He said defendant has some systemic delusions and that his intellect is very good but he has almost no balance in being able to control a generous emotional nature. He also stated that he felt defendant would not be safe in society without supervision. In response to the hypothetical question, the doctor stated he was of the opinion that at the time of the crime defendant was suffering from a mental defect or disease, that he had no choice but to go through with his impulse because he did not have the necessary brake deterrents. He described this as a psychotic reaction. He was also of the opinion that the defendant at the time of the crime was not able to distinguish right from wrong, that he was obviously not capable of choosing to do or not to do the act, and that he was not capable of governing his conduct in a choice between right and wrong.

Walter Moore, a physician specializing in nervous and mental diseases, neurology and psychiatry, and a professor of neurology and psychiatry at St. Louis University school of medicine, testified for the prosecution. He examined de-

fendant in January, 1964, and used a questioning procedure. He said he found no disturbance in the patient's conduct or attitude, that he found no hallucinations or delusions, and that he found no evidence of schizophrenic behavior. In response to a hypothetical question, he stated that he was of the opinion that defendant knew the difference between right and wrong and stated that there was no evidence that he was a victim of irresistable impulses. On cross-examination he admitted that he did not give any of the standard psychological tests and explained that he did not feel that they were necessary. He said that such tests are applied more in evaluating various assets in the personality structure for therapeutic purposes and not for diagnosis. He stated he does no testing for diagnosis. He felt that by studying the behavior of an individual he can reach a conclusion within a half hour whether the patient is psychotic or not and that he could do this regardless of whether he gets any background or whether the person co-operates in his responses.

James H. Kriemeyer, a doctor of medicine with some special training in psychiatry and Clinical Director at the Rush State Hospital in Texas, testified for the prosecution. He examined the defendant in March, 1962. He said that defendant showed evidence of sociopathic personality disorder but that he was not psychotic. In response to the hypothetical question, he said he was of the opinion that defendant knew the difference between right and wrong, that it was possible for him to choose to do or not to do an act and that it was possible for him to govern his conduct in accordance with such choice. On cross-examination he admitted that he did not give any psychological tests, but like Doctor Moore, stated that the psychological tests are not diagnostic. Doctor Kriemeyer did obtain a social history from the defendant in the course of his examination.

Groves B. Smith, a physician and psychiatrist, a consulting psychiatrist to the Department of Public Safety of Illinois, and in charge of psychiatrics at Menard, also testi-

fied for the prosecution. He examined defendant in January, 1964. In response to the hypothetical question, he testified that in his opinion there was no evidence that defendant was suffering from any illness other than a sociopathic personality, which is not a mental illness. He further stated that he was of the opinion that defendant had knowledge of the difference between right and wrong, that he had the ability to evaluate the circumstances, that he was able to evaluate the reactions that would result from those circumstances, and that he was able to make a choice, which he did.

Defendant argues that an adequate examination of the defendant should consist of (1) a complete sociological and medical case history, (2) a thorough psychiatric examination including psychological tests, and (3) a complete physical examination. He concludes that since the examinations performed by the doctors who testified for the prosecution did not consist of all three phases, we should, as a matter of law, disregard their testimony.

While there is medical authority for defendant's position as to what constitutes an adequate examination, there is also medical authority for the position that psychological tests are not necessary for diagnostic purposes. Doctor Moore, an eminent psychiatrist, and Doctor Smith were both of the opinion, for example, that psychological tests were not necessary for diagnostic purposes. In view of the basic disagreement among psychiatrists as to what constitutes an adequate examination, we cannot, as a matter of law, say that the examinations conducted by Doctor Moore, Doctor Kriemeyer, and Doctor Smith were not adequate and that their testimony should be disregarded.

Defendant states that he is aware of the cases holding that he has the right to cross-examine and to bring out before the jury the basis or type of examination upon which a psychiatric opinion is based and that he has the right to present his own expert to bring out the inadequacies of a psychiatric examination. He argues, however, that these

safeguards are a fiction in this case because the prosecution had clever witnesses with impressive qualifications and because he was without funds to produce equally impressive witnesses. Later, in his brief he puts this same argument into constitutional phraseology and argues that he was denied equal protection of the law and due process of law in that he did not have sufficient funds to obtain an adequate psychiatric examination with objective psychological tests.

This same argument was presented to us in *People* v. *Carpenter,* 13 Ill.2d 470, and rejected, when we stated at pages 480 and 481, "Petitioner's arguments that permitting the State to have three psychiatrists examine Carpenter was so unfair as to amount to a violation of due process of law necessarily proceeds upon the assumption that the psychiatrists employed by the State were biased and prejudiced and that their testimony was not an honest evaluation of their examination, for certainly it cannot offend due process of law for one who puts in issue the question of his insanity to have the benefit of all the expert evidence obtainable. As the United States Supreme Court stated in *Solesbee* v. *Balkcom,* 339 U.S. 9, 70 S. Ct. 457: 'We would suppose that most if not all governors, like most if not all judges, would welcome any information which might be suggested in cases where human lives depend upon their decision.' The court and the jury in the present case were likewise entitled to the benefit of all of the evidence that was obtainable. There is nothing whatsover in the record before us to indicate in any manner that the psychiatrists who testified for the State did other than give their honest and unprejudiced opinion based upon their special knowledge and their examination of Carpenter. We find no violation of any of Carpenter's constitutional rights by reason of this examination and testimony."

Defendant was examined by five psychiatrists, each of whom felt that his examination was adequate for expressing an opinion of defendant's mental capacity when the crime

was committed. As we pointed out, we cannot state, as a matter of law, what is or is not an adequate examination. The qualifications, opinions and bases for opinions of these psychiatrists were very thoroughly explored by strenuous cross-examination. Their testimony, which covers some 230 pages in the record, appears to have presented everything that could be presented on this issue to the jury. There is absolutely nothing which indicates that more examinations by more psychiatrists and more expert testimony would produce a different result.

Whether defendant was insane at the time of the crime was, of course, a jury question. The jury was presented with an abundance of testimony on the issue by five experts. There was a conflict (on the issue) among the experts which the jury resolved against the defendant. We have carefully reviewed the testimony and are of the opinion that the jury was entirely justified in finding defendant was sane at the time of the crime.

Defendant also complains about the instructions on the insanity issue. He argues that People's instructions Nos. 8 and 9 failed to advise the jury that they must, "beyond a reasonable doubt," find him sane. People's instructions 8 and 9 are verbatim instructions Nos. 17 and 18 which this court approved in *People* v. *Carpenter,* 11 Ill.2d 60. Furthermore, the court gave defendant's instruction 13 which told the jury that the burden of proof was on the prosecution to prove, beyond a reasonable doubt, that he was sane at the time of the commission of the act charged.

It is also asserted that the jury should have been instructed on the statutory definition of insanity contained in section 6—2 of the Criminal Code of 1961, (Ill. Rev. Stat. 1965, chap. 38, par. 6—2,) rather than the common-law definition enunciated in *People* v. *Carpenter,* 11 Ill.2d 60. The *Carpenter* case, approving the common-law elements of knowledge, ability to choose and ability of governing conduct in accordance with choice, was decided in March, 1957;

the crime here was committed on August 30, 1961, and section 6—2 of the Criminal Code did not become effective until January 1, 1962. Defendant acknowledges that the substantive law in existence at the time a crime is committed controls at the trial for that crime. He argues, nevertheless, that it would have been "fairer to him" to use the "current enlightened definition." The short answer to this argument is that defendant did not tender an instruction based on section 6—2 and the court did instruct on the law as it existed at the time of the crime.

It is next argued that the petitions for change of venue should have been allowed both as to forum and as to judges. We direct our attention first to the petition alleging prejudice of the judges. On December 16, 1963, defendant filed a petition praying for a change of venue from all four circuit judges of the judicial circuit. The petition stated that three of said judges had already made rulings on the merits of the case. This petition was properly overruled by the court.

Section 21 of "An Act to revise the law in relation to change of venue," (Ill. Rev. Stat. 1963, chap. 146, par. 21) which was in force at the time of this trial, provides that a petition for change of venue may be filed because of the prejudice of a judge or any two of them. This provision is incorporated in section 114—5 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1965, chap. 38, par. 114—5.) In *People* v. *Chambers*, 9 Ill.2d 83, we held that the allegation of the prejudice of more than two judges in a petition for change of venue violates the terms of the statute and warrants a denial of the petition. It was there explained that if it were permissible to name more than two judges, the section prohibiting a change of venue from the county would be circumvented in circuits having only three judges and that this ruling would be applied even if the circuit had more than three judges. Furthermore, it is a well-settled rule that a petition for a change of venue after the court has ruled

on any matter going to the merits of the case comes too late. *People* v. *Golson,* 32 Ill.2d 398; *People* v. *Wilson,* 29 Ill.2d 82; *People* v. *Deweese,* 27 Ill.2d 332.

On December 19, 1963, the defendant filed a second petition for change of venue alleging the prejudice of two of the judges of the circuit. This motion was allowed and the case was assigned for trial to one of the remaining judges. We find no error with respect to the rulings on the petitions for change of venue as to the judges.

On October 18, 1963, defendant filed a petition for a change of venue because of the prejudice of·the inhabitants of the county in which he was to be tried. The petition alleged that there had been highly prejudicial remarks made by the various news media within a 100 mile area of St. Clair County. The State's Attorney filed his affidavit in opposition to the petition stating that with the exception of one editorial in a St. Louis newspaper published in September of 1961, the news media coverage was simply reports of the various investigations and legal proceedings reported in an objective manner. Five days later a memorandum in support of said petition was filed listing the dates and captions of almost 200 headlines, articles and pictures appearing in newspapers within a 100 mile radius of St. Clair County. The memorandum also listed approximately 86 lead announcements and pictures by local TV stations and frequent and regular radio broadcasts included in approximately 156 news broadcasts per day by local stations. Maps and tables showing the circulation and percentage of coverage by the various news media were included in the first memorandum. The prosecution filed its memorandum in opposition to the petition setting forth in substance that there had been substantial news media coverage, but that no inference could be drawn therefrom that the inhabitants of the county were prejudiced and that the only affidavits in support of the petition were by the defendant and his counsel. Defendant filed a second memorandum in support

of the petition on October 25, 1963. This memorandum contains photos of many local newspaper articles and affidavits by attorneys for the defense that between them they had talked to at least 300 random residents of St. Clair County and there was prejudice evident in the minds of people in this area.

On October 28, 1963, the court entered an order denying the prayer of the petition. Two days later the defendant filed a petition for rehearing of his motion for change of venue and attached thereto 62 affidavits supporting his allegation of prejudice. On November 5, 1963, the State's Attorney filed a reply to the petition for rehearing and attached to his reply 131 counteraffidavits. Defendant then made a motion to require the State's Attorney's office to fully identify the affiants. This motion was denied. The court again denied the petition for change of venue and also denied defendant's request that it subpoena additional residents for the court to examine regarding the charge of prejudice on the part of the inhabitants of the county.

"A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field." (*Sheppard* v. *Maxwell,* 384 U.S. 333, 86 S. Ct. 1507, 1515, 16 L. Ed. 2d 600, 613.) Nevertheless, the courts have the duty of trying in each case to strike a proper balance between freedom of the press and a defendant's right to be fairly charged and fairly tried in a public tribunal free of prejudice, passion and excitement.

In *Irvin* v. *Dowd,* 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751, the Supreme Court held that highly prejudicial news reporting had deprived the defendant of a fair trial. The court laid down the following guidelines as to impartialty of prospective jurors: "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity and scarcely any of

those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751, 756.

The court in the *Irvin* case, after summarizing the highly prejudicial publicity that had been directed against the defendant, made the following observation:

"It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitment and fostered a strong prejudice among the people of Gibson County. In fact, on the second day devoted to the selection of the jury, the newspapers reported that 'strong feelings, often bitter and angry, rumbled to the surface,' and that 'the extent to which the multiple murders—three in one family—have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions * * *.' A few days later the feeling was described as 'a pattern of deep and bitter prejudice against the former pipefitter.' Spectator comments, as printed by the newspapers, were 'my mind is made up'; 'I think he is guilty'; and 'he should be hanged.'

"Finally, and with remarkable understatement, the headlines reported that 'impartial jurors are hard to find.' The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State; 12 persons and

two alternates were selected as jurors and the rest were excused on personal grounds, *e.g.,* deafness, doctor's orders, *etc.* An examination of the 2,783-page voir dire record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. 717, 726, 81 S. Ct. 1639, 1644, 6 L. Ed. 2d 751, 758.

This case is substantially different from the *Irvin* case. Here the news media coverage concerned reports of the crime, investigations and legal proceedings, and was, for the most part, done in an objective manner. Furthermore, a great deal of this news coverage occurred at the time of the crime, which was two years prior to the time that defendant was tried. Unlike the *Irvin* case, where the *voir dire* examination lasted some four weeks, the panel consisted of 430 persons, the record of *voir dire* examination covered 2,783 pages, and ten of the members of the panel were never asked whether or not they had any opinion; in this case, eight jurors were accepted the first day from 27 examined and the 12 jurors who heard the case were accepted within two days, the panel consisted of 120 persons, the record of *voir dire* examination covered 300 pages, and all members of the panel were asked whether or not they had any opinion. We have carefully read all of the *voir dire* examination and find that only about seven of the prospective jurors stated that they were prejudiced against the defendant, and these jurors were, of course, excused. All of the jurors admitted having read of the case, but most of the jurors were excused because they did not believe in capital punishment, they did not believe in an insanity plea, they felt that the fact that they had small children might influence their verdict and various reasons other than a preconceived opinion of the defendant's guilt or innocence.

We are of the opinion that defendant was tried before an impartial jury.

Defendant then argues that the court erred in the admission of evidence. He first complains that photographs of Carole Ballard should not have been admitted into evidence because the police officers had described the body as they found it and the photographs, therefore, could serve no useful purpose other than to anger and inflame the passions of the jury. The admission of photographs of the decedent is, of course, discretionary with the trial judge. (*People* v. *Hoffman*, 32 Ill.2d 96; *People* v. *Adams*, 25 Ill.2d 568; *People* v. *Jenko*, 410 Ill. 478.) We carefully examined the photographs and can not say that the trial court abused his discretion in admitting them into evidence. *People* v. *Jenko*, 410 Ill. 478.

He also argues that the .22 revolver should not have been admitted. This argument is based on the assertion that the only evidence tending to connect the defendant, the gun and the crime committed is the defendant's confession which should not have been admitted in evidence. As we have pointed out, defendant's confession was properly admitted into evidence and the confession does connect the defendant, the gun and the crime.

It is next argued that the court erred in refusing certain evidence offered by the defendant. He first argues that his responses to the psychiatrist while under the influence of sodium pentathol should have been admitted in evidence. He disposes of any hearsay objection by stating that his responses while under the influence of sodium pentathol would be admissible only for the purpose of showing his mental condition and not for the purpose of proving the truth of what was asserted in the responses.

The problem of allowing the responses made while under the influence of drugs to be presented to the jury is much the same as that of using prior contradictory

statements of a witness to impeach his testimony. While the use of such statements for impeachment is an accepted technique, (*People* v. *Moses,* 11 Ill.2d 84,) we have recognized the danger that the jury may consider the prior statements as substantive evidence rather than impeaching evidence. In *People* v. *Tate,* 30 Ill.2d 400, we stated at page 403, "But impeachment by a prior inconsistent statement has never been entirely satisfactory because of the difficult mental operation it imposes upon the jurors. 'If a jury is not to be trusted to evaluate hearsay evidence properly, it may be doubted that it could consider it for one purpose but avoid being influenced by it for another purpose.' (133 A.L.R. 1454, 1466.)." (See also *People* v. *Paradise,* 30 Ill.2d 381, 384.) On the other hand the reasons underlying an opinion are usually more persuasive than the opinion itself. Cleary, Handbook of Evidence, sec. 11.4 (2d ed. 1963.)

The defendant has cited *People* v. *Cartier,* 51 Cal.2d 590, for the proposition that a psychiatrist may testify to responses made by a patient while under the influence of drugs. The prosecution, however, has cited *People* v. *Ford,* 304 N.Y. 679, 107 N.E.2d 595, where a psychiatrist was not permitted to testify as to his examination of a patient while under the influence of sodium amatol. In *State* v. *White,* 60 Wash. 2d 551, 374 P.2d 942, the court took the middle ground and held that it was not an abuse of the trial court's discretion to permit a psychiatrist to explain the use of sodium amatol and desoxyn and to give his opinion of the patient's mental condition based on his examination of the patient while under the influence of these drugs, and to exclude tape recordings or testimony of the interview with the patient.

The citations and arguments on this point do not lend themselves to a full discussion of this issue nor does the record here presented require a more detailed discussion of the point at this time. As we have pointed out, Doctor Folsom was permitted to discuss this type of an examination

and his findings based upon such examination. There is nothing to indicate that defendant's responses while he was under the influence of sodium pentathol were necessary for the jury to understand the psychiatrist's findings or opinion based upon such examination. It was not error for the trial court to exclude testimony concerning defendant's responses while under the influence of the sodium pentathol.

Defendant then contends that letters written by Donna Marie Stone and the defendant should have been admitted in evidence, not for the purpose of proving any of the assertions contained in them, but for the purpose of showing his mental condition. The record reveals that John Norton, an attorney, appeared at the trial in response to a *subpoena duces tecum* served on him by the defense demanding correspondence between Donna Marie Stone and the defendant. Norton refused to deliver any correspondence in his possession on the grounds that they were part of his work product, that they constituted a privileged communication between attorney and client, and that they might tend to incriminate his client, Donna Marie Stone. We think that the trial court properly refused to order the letters belonging to Donna Marie Stone to be produced after the privilege against self-incrimination had been invoked.

The privilege against self-incrimination forbids the compulsory production of documents, containing assertions made by the person invoking the privilege, (*Lamson* v. *Boyden,* 160 Ill. 613) and it has also been held to preclude compulsory production of documents in his possession, even though they do not contain assertions by him, where such documents will furnish a link in the chain of evidence by which he might be convicted of a crime. (*People* v. *Zazove,* 311 Ill. 198.) Furthermore, we think under the facts of this case that the privilege could be invoked by counsel for Donna Marie Stone. Professor Wigmore has stated, "The rule is that the privilege must be claimed personally; however, the courts, especially when the witness is a party or

when the situation otherwise demands, frequently permit counsel for the witness to call the witness's attention to the privilege or to plead it in his behalf." (8 Wigmore, Evidence, (McNaughton Rev.) sec. 2270.) Here the privilege was invoked for Donna Marie Stone who at the time of the trial was 15 years old and she was not present at the trial.

It is argued that defendant should have been permitted to call Donna Marie Stone as a witness. The prosecution argues that she was to be called in surrebuttal, that defendant had developed his defense in his case in chief, that the prosecution presented no new affirmative matter in rebuttal and the trial court properly exercised its discretion in not allowing her to be called. We believe the trial court properly exercised his discretion, but we choose not to place our holding on so narrow a ground. As we have pointed out, her counsel had already invoked the privilege against self-incrimination as to letters belonging to her, and it must have been apparent to the trial court that her counsel would again invoke the privilege if she were called to the witness stand. We have condemned the practice of calling a co-defendant as a witness where the witness refused to testify, thereby compelling him to claim his privilege against self-incrimination. (*People v. Haran,* 27 Ill.2d 229; *People v. Bennett,* 413 Ill. 601.) While an examination of such a witness adds little material evidence, it operates to prejudice the defendant in the eyes of the jury. Although Donna Marie Stone was not a co-defendant and she was being called by the defense rather than the prosecution, the effect would have been the same as a co-defendant called by the prosecution.

We come now to the closing argument of the prosecution which the defendant says was improper and prejudicial. We note immediately that defendant was represented by two able attorneys who did a voluminous amount of work. These attorneys made no objection to any of the closing arguments complained of. While failure to object to argument by the prosecutor normally waives the right to raise the point on

review, (*People* v. *Donald,* 29 Ill.2d 283; *People* v. *Smith,* 25 Ill.2d 219,) we will review the argument to ascertain if it is so seriously prejudicial that it has deprived defendant of a fair trial. (*People* v. *Fort,* 14 Ill.2d 491; *People* v. *Moore,* 9 Ill.2d 224.) Furthermore, when the death penalty has been imposed, we require the absence of prejudicial error even though the proof of guilt is clear. *People* v. *Bernette,* 30 Ill.2d 359.

Defendant first argues that the prosecutor made threats and appeals based upon the fears of the jury. His counsel had argued, "If we can learn one thing that can save one human life by sparing John Myers and placing him in a mental institution then I say it is worth a gamble because he is going to be no problem as long as he is behind bars and we can learn from him fine." In reply the prosecution argued, "Let us all say that it will do no good to kill John Myers. He says let us take a gamble. Are you going to gamble he goes to the security hospital? Are you going to gamble in a few years he will find no psychiatrist saying that John Myers is psychotic? If the inevitable takes place you have given him the gun and said good boy, John, go out and kill another Carole Ballard." We think the prosecution's argument was a legitimate reply which was invited by the defendant's argument.

Furthermore, this argument is based on the evidence and the reasonable inferences therefrom. (*People* v. *Miller,* 13 Ill.2d 84.) Doctor Smith, the consulting psychiatrist of the Department of Public Safety and also a consultant on the staff of the Illinois Security Hospital, had testified that the defendant is sane. The jury could conclude that if it should acquit defendant on the basis of insanity, he would be sent to the security hospital and thereafter released.

It is also argued that the prosecutor made prejudicial remarks personally to the defendant by calling him "a slimy beast—a little low in morals like a snake," and that he suggested defendant was a sexual psychopath. The prose-

cutor stated "And God help us if his conduct is normal conduct. Let us all give up if that is all we can expect to be, if that is the normal conduct that this slimy beast is going to be equated with." The prosecutor also argued "Is it bizarre to be with a girl 13 years old that looks like 18? It may be a little nasty and a little filthy; it may be something so low in morals like a snake might do. But psychotic no. He may be a sexual psychopath but not psychotic."

Again we think this argument was a legitimate reply to the defense argument concerning normality and that defendant's relationship with a 13-year-old girl demonstrated his psychosis. The two psychiatrists who testified for the defense, as well as defendant's attorney, all made comparisons of defendant's conduct and ability to choose between right and wrong with that of animals such as a chimpanzee, a dog, and a trained animal.

Defendant also complains of the prosecutor commenting upon the grief of Mrs. Ballard. Defense counsel had himself twice mentioned the grief of the widow. Thus, this topic was invited by defense counsel. Under these circumstances, the prosecutor's comments concerning the grief of the widow were not prejudicial. See *People* v. *Brown,* 30 Ill.2d 297; *People* v. *Wright,* 27 Ill.2d 497.

Defendant also complains about the prosecutor commenting upon the murder of George Ballard. We find nothing improper in the comments the prosecutor made concerning the murder of George Ballard. See *People* v. *Ciucci,* 8 Ill.2d 619.

We have carefully reviewed the closing arguments in this case. The usual arguments and appeals for and against a death sentence were presented to the jury. We find no prejudicial error in the prosecutor's argument.

Defendant's final contentions center about his request for post-trial hearing regarding mitigation of his sentence. He was sentenced on April 9, 1964. On April 28 his two newly appointed appellate counsel filed a motion to vacate

the judgment and conduct a hearing as to matters in aggravation or mitigation of the offense. His counsel filed a 13-page brief of facts and comments in support of the motion to modify the sentence which included, in effect, a proffer of evidence in mitigation. Two weeks later the State's Attorney filed a memorandum in opposition to the motion. After a hearing the court denied the motion because "sufficient evidence was presented at the trial to be considered by the Court" and because "before pronouncing sentence the Court asked defendant and his counsel if they had anything further to present and they answered in the negative, thereby waiving the presentation of any further evidence in mitigation."

The People assert that after the motion for a new trial had been denied and defendant was sentenced to death, an appeal was automatically perfected (Ill. Rev. Stat. 1965, chap. 110, par. 101.27(5)(a),) and the trial court had no jurisdiction to vacate judgment. (See *People v. Miller,* 13 Ill.2d 84, 110.) Defendant's only reply to this assertion is that the court did consider the motion on its merits when he found that "sufficient evidence" had been presented at the trial. In response to the finding that a hearing in mitigation and aggravation had been waived, (see *People* v. *Muniz,* 31 Ill.2d 130,) defendant points out that his trial counsel filed an affidavit showing they did not understand the judge's question "do you have anything further" and therefore there was not a knowing waiver. Upon the pronouncement of sentence the appeal was automatic and the trial court no longer had jurisdiction.

We have examined the proffered evidence in support of defendant's motion to modify the sentence under the statute. (Ill. Rev. Stat. 1965, chap. 38, par. 121—9(b)(3).) We summarize the facts set out in the brief supporting the motion.

His parents were killed in an accident and he was raised in an orphanage. When he was 14 years old, he had sex re-

lations with a girl at the orphanage, and he and the girl were stripped and whipped in front of each other. After leaving the orphanage, he worked on a farm, where he claims he was always being blamed for the wrong doing of another boy. He had an argument with his boss, who beat him, so he left the farm with the boss's car and wrecked it. When he was 17 years old, he enlisted in the Navy with the permission of the juvenile court. He claims the Navy deprived him of a leave and he, therefore, went A.W.O.L. He was court martialed and received a dishonorable discharge.

He was married when he was 20 years old. About this time he received a three-year sentence for stealing a car and served 17 to 18 months of this sentence. In 1952 his wife left him, and he remarried. Although he was guilty of bigamy, he was never prosecuted. He was charged, however, with nonsupport and child abandonment of his three children and received a five-year sentence. He was placed on probation and his probation was later revoked when he was accused of stealing from his employer. He served 28 months in prison before being paroled. Later he worked in a restaurant where he was accused of taking $75, which he claims was taken by a girl.

In the summer of 1960 he was living in Chicago and was having sex relations with a married woman of the family with whom he roomed. This woman became pregnant. About this same time he met Donna Marie Stone, who was then 12 years old. He left Chicago to appear in court in Minnesota in a child abandonment case. He did not appear, however, and since he had "jumped bond" he went West. In February of 1961, he returned to Chicago and states that things became tense. The married woman accused him of having intercourse and engaging in deviate sex conduct with Donna and threatened to tell Donna's mother. Donna learned that the defendant was the father of the married woman's last baby and threatened to tell her husband.

In the summer of 1961 Donna went to Edwardsville to

visit her grandmother, and defendant met her there. Defendant told Donna he was going to St. Louis and she insisted on going with him. She took her uncle's gun, which they later used in the killings. The facts concerning the burglary of a farm house, the killing of George Ballard and Carole Ballard, the robbery at the Graham farm house, and the taking of Margaret Wernicke as a hostage are then related. The proffered facts then show that Margaret Wernicke was taken to Missouri. After defendant had tied Margaret, Donna shot her in the back. This did not kill her so defendant suggested hitting her in the head with stones, and he finally shot and killed her himself. He and Donna then had intercourse in the car. They drove on to Texas where they picked up a hitchhiker who was with them several hours. Defendant then shot and killed the hitchhiker and took his wallet. A few hours later defendant and Donna were apprehended in Texas, Defendant and Donna exchanged lengthy letters primarily discussing their extremely deviate sex relations.

Defendant was convicted of murder in Texas and received a death sentence. (We observe parenthetically that that conviction was reversed by the Court of Criminal Appeals of Texas, (*Myers* v. *State,* 365 S.W.2d 932,) upon the sole ground that during the jury's deliberation "new testimony" concerning the ability and credibility of medical witnesses was given by certain of the jurors to the others.) Defendant's only interest during the trial centered around Donna. After the trial Donna no longer wrote to him. He then wrote letters to Donna's mother threatening that he would expose Donna's deviate sex experience if she did not write to him. He did not show any concern for his own fate, nor remorse for what he had done nor remorse for involving Donna.

The foregoing facts, which defendant's counsel state can be established by competent evidence, certainly do not mitigate, but, on the contrary, aggravate. Defendant's at-

torneys state, "We realize that the jury has purportedly answered these questions (question of defendant's sanity at the time of the killings) and that the motion for a new trial has been overruled. We are not attempting to have the court reconsider his previous decision on the issue of a new trial or a judgment notwithstanding the verdict. However, we respectfully submit that for the purpose of sentencing, the court should consider the many aspects of this presentation."

Despite the protestation of defendant's attorneys, it is apparent that they did not intend to present evidence in mitigation of the offense, but that they intended to relitigate the insanity issue. This becomes abundantly clear in the comment portion of the brief filed in the trial court. Their comments are nothing but an argument that defendant was insane at the time of these murders, that all the evidence tending to show insanity was not presented at the trial and that the trial court should consider this additional evidence in imposing his sentence.

The answer to this contention is obvious. If the trial court believed defendant was insane at the time of the crime, the court could not modify his sentence to an indeterminate number of years as counsel suggests; rather the court would have to vacate the sentence and enter a judgment of not guilty by reason of insanity. The jury found defendant was sane at the time of the crime and the trial court denied a motion for a new trial and entered a judgment on the verdict. We think the trial court properly denied defendant's request to relitigate the issue of insanity for the purpose of modifying the sentence to an indeterminate number of years.

We have carefully reviewed the record and are convinced that the defendant had a fair and impartial trial. He was aggressively defended by two able counsel at his trial and two other able counsel have presented his case for a thorough review. The record leaves no doubt that he committed the murder and the jury was justified in finding that he was sane at the time of the crime. The crime he com-

mitted was brutal and atrocious and there is no justification for our interference with the verdict of the jury or the judgment of the court.

The judgment of the circuit court of St. Clair County is affirmed. The clerk of this court is directed to enter an order fixing Friday, January 13, 1967, as the date on which the original sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the warden of the Illinois State Penitentiary at Menard.

*Judgment affirmed.*