THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* WALLACE FORD, JR., Appellant.

Argued May 28, 1952; decided July 15, 1952.

*James W. Murray* and *Sherwin V. Wittman* for appellant.

*Wallace J. Stakel, District Attorney,* for respondent.

Judgment of conviction affirmed; no opinion.

Concur: LEWIS, DYE, FULD and FROESSEL, JJ. DESMOND, J., dissents and votes to reverse the judgment of conviction and for a new trial in opinion in which LOUGHRAN, Ch. J., concurs. Not sitting: CONWAY, J.

DESMOND, J. (dissenting). Defendant was convicted of murder in the first degree for the killing of his sister-in-law, and was sentenced to death. Of the several points argued by his counsel, one only merits discussion here, but that point discloses an error which requires a reversal of the conviction.

The attorneys assigned by the court to represent defendant retained, with the court's permission, two psychiatrists to examine defendant. Both testified as defense witnesses. Neither was of the opinion that defendant was " insane ", under the old common-law test which has been written into section 1120 of the Penal Law, but both thought, as did the psychiatrists who were called by the People, that defendant was a " psychopathic personality ". The killing was freely admitted by defendant, but his psychiatrists were both of the opinion that he was incapable of premeditation or deliberation. The homicide was a brutal one, without reasonable motivation, and there was much in defendant's history to mark him as a man who had little judgment or intelligence, and made little use of what he had. The jury had to decide whether there had been enough of premeditation and deliberation to make out first degree murder, and the jury must have wrestled hard with that question, since they returned, after some deliberation, to hear again the court's definition of " premeditate ". For all those reasons, it was most important that the jurors have the full benefit of whatever defendant's experts had to offer in proof of their assertions that defendant, while not " legally insane ", was of limited mental capacity.

Dr. Yochelson, one of the psychiatrists called to the stand by defendant, had had three interviews with defendant, at the county jail, on three different days. He told the court and jury what he had observed on the first and third of those occasions, but as to the second, he was not allowed to testify. It appeared that, after hearing from defendant, at the first interview, a rambling and incredible story of the occurrences on the night of the killing, Dr. Yochelson, on his second visit to the jail, injected into defendant a dose of sodium amytal, popularly called " truth serum." The District Attorney objected to any testimony as to what happened after that. The witness was allowed, however, to explain that sodium amytal injections produce drowsiness and result in uninhibited disclosures by the subject, and that their use is a recognized method for testing mental conditions. He swore that he himself had used such tests more than three thousand times, that he had lectured about them and demonstrated them clinically to students, and that, while not infallible or universally accepted, the method was a standard and valid one. He was not asked to confirm these statements, but our own investigation bears them out (see, for instance, Journal of the American Medical Association, Vol. 95, No. 16, Oct. 18, 1930, p. 1168; American Journal of Psychiatry, Vol. XI, 1932, pp. 1083–1091; American Journal of the Medical Sciences, July, 1945, p. 125 *et seq.*; Physical Methods of Treatment in Psychiatry, by Sargant and Slater, 1948, pp. 132–138; American Practitioner and Digest of Treatment, Jan., 1950, p. 148 *et seq.*).

After Dr. Yochelson had thus stated his own qualifications, and had described the purposes and utility of the test and its acceptance by the profession, the Trial Justice refused to let him give any further testimony as to the second interview or meeting with defendant, that is, the one at which defendant was under the influence of the drug. The ground for that ruling was that there was no showing that the details and results of such a test had ever been admitted in evidence in a New York court. Actually, we did discuss the use of sodium amytal, for testing sanity, in 1942, in *People* v. *Esposito* (287 N. Y. 389) and we there (see p. 397) referred to it as one of the " methods set up objectively by the medical profession for the proper determination of such claims ", that is, claims of deranged mental condition. But whether the courts, or the cases, approve of sodium amytal testing was not the point at all. This psychiatrist, after

showing his own qualifications and extensive experience, had described the test as a valid one in common use. Having thus established himself as one whose opinion was acceptable, he was entitled to give, and defendant was entitled to put before the jury, the facts on which that opinion was based. " It was essential that the jury should be informed as to the facts upon which the expert based his conclusions in order to determine whether they were well founded " *People* v. *Strait* (148 N. Y. 566, 570) recently quoted with approval in *People* v. *Samuels* (302 N. Y. 163, 172) and see other decisions cited in the *Samuels* opinion; also, see, *People* v. *Youngs* (151 N. Y. 210, 218). As Judge BARTLETT wrote in *People* v. *Nino* (149 N. Y. 317, 327) : " These general principles are elementary; the jury are entitled to all the facts on which the expert bases his opinion. If he answers a hypothetical question, the facts therein set forth have been proved on the trial; if he rests his answers on facts and knowledge he has acquired himself, he must impart them to the jury." Other relevant material may be found in *Matteson* v. *New York Central R. R. Co.* (35 N. Y. 487, 490, 491) ; *Marx* v. *Ontario Beach Hotel & Amusement Co.* (211 N. Y. 33, 39) ; *People* v. *Soper* (243 N. Y. 320, 327, 328) ; *People* v. *Kohlmeyer* (284 N. Y. 366, 369, 370) ; *People* v. *Draper* (278 App. Div. 298, affd. 303 N. Y. 653) ; 2 Wigmore on Evidence ([3d ed.], § 445), and 2 Wharton on Criminal Evidence ([11th ed.], p. 1679).

This expert witness did state an opinion in answer to a hypothetical question, and he gave that same opinion as based on the first and third interviews, but as to that part of his knowledge or impression which he acquired by testing, he had to remain silent. It is not for us to guess what that testing did show, or what the psychiatrist would have claimed for it. The case should, therefore, be tried again.

*People* v. *Forte* (279 N. Y. 204) which approved a trial court's refusal to give a defendant permission for a " lie detector " test has nothing to do with our question here. Forte wanted to have the " lie detector " mechanism report to the court whether he was telling the truth, and such a mechanical method of answering that question is not yet accepted by our courts (see Richardson on Evidence [7th ed.], § 534). Nothing so startling was attempted by the defense here.

The judgment of conviction should be reversed, and a new trial ordered. [See 304 N. Y. 759.]