STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
DONALD G. LEVITT, DEFENDANT-RESPONDENT.

Argued November 6 and 8, 1961—Decided December 18, 1961.

*Mr. Martin J. Queenan,* Burlington County Prosecutor, argued the cause for the plaintiff-appellant.

*Mr. James M. Davis, Jr.,* argued the cause for the defendant-respondent (*Messrs. Powell and Davis,* attorneys; *Mr. Samuel P. Orlando,* of counsel).

The opinion of the court was delivered by

PROCTOR, J. After the defendant was convicted in the Burlington County Court of committing a private act of lewdness in violation of *N. J. S.* 2*A* :115–1, the trial judge granted the defendant's motion to set aside the verdict and for a new trial. The order stated it was the trial judge's opinion that "misconduct occurred in the jury room of such a nature as to vitiate the verdict returned by the jury on the grounds of bias, passion, prejudice or mistake." The Appellate Division granted the State leave to appeal and while the appeal was pending we certified the matter on our own motion. *R. R.* 1 :10–1(a).

There is no need for us to narrate in detail the evidence presented at the trial. For our purposes it is enough to say that the State's sole witness was a patient of the defendant who is a physician. She testified that he committed an indecent act upon her while she was in an hypnotic state and during the course of being treated by him. The defendant denied the alleged offense. The turning point of the case was the extent of the credibility accorded the testimony of the complaining witness as against that of the defendant and his witnesses, including twenty-five who attested to his reputation.

The day after the jury returned its verdict of guilty, one of the jurors telephoned the trial judge and requested an appointment. At their meeting in his chambers, she informed him of certain allegedly prejudicial statements made by other jurors during the jury's deliberations. Thereupon he relayed this information to the Prosecutor and counsel for the defendant. Seasonably the defendant moved for a new trial on several grounds including:

"3. The verdict of the jury was the result of misconduct on the part of the jury.

4. The verdict of the jury was the result of passion, prejudice, bias and mistake.

5. The verdict of the jury resulted from the making of inflammatory statements by the County Prosecutor.

6. The verdict of the jury was the result of harmful and prejudicial error committed by the trial judge."

In support of the motion, defendant submitted an affidavit of the informing juror which in pertinent part reads:

"The jury took three ballots before reaching its determination. The first vote was taken approximately one-half hour after the jury had retired to the jury room. Between the taking of the first ballot and the second, there was considerable conversation and discussion in the jury room among all of the jurors. During such conversation and before taking the second ballot, one of the members of the jury who took a leading role in the discussions commented upon Dr. Levitt's appearance and said, 'How could anyone go to him because just a look at him leads to the conclusion that he is a person capable of doing the things that he is charged with,' whereupon another woman member of the jury agreed with her. Shortly thereafter the question came up regarding what effect should be given to the character witnesses. Again the woman member of the jury who was taking a leading role stated, 'Did you notice the character witnesses * * *,' and a male member of the jury stated, 'Yes, "characters"!' Then the same woman said, Did you notice most of them were Jews and even one of them was from the Synagogue.' "

The hearing on the motion was adjourned to permit the Prosecutor to investigate the allegations in the affidavit. Thereafter, county detectives obtained statements from the remaining jurors. Some of these were sworn to, others were not; some supported the charges, others contradicted them.

At the subsequent hearing, the trial judge, after finding that defendant's other grounds "standing alone" were insufficient to warrant the granting of a new trial, considered the affidavit of the juror who first brought the matter to his attention and the affidavits and statements of the eleven other jurors. He said:

"However, now we have one more facet added to the whole complexity of this situation; namely that somebody for some reason injected the question of this man's religion, and apparently the religion of many of his character witnesses, into the deliberations of the jury.

The trial judge was concerned with "whether or not there was any passion, prejudice or mistake in that jury room." He ordered a new trial after concluding:

"There seems to be little doubt in this case this man's religion [defendant is Jewish] was injected into the deliberations of this jury; that is corroborated. There seems to be little doubt that at least one person on that jury was affected, and it seems prejudicially so and it makes little difference that the infection was only slight so long as it is present.

\* \* \* \* \* \* \* \*

[T]he deliberations \* \* \* should be free of taint of passion, prejudice or mistake."

While on this appeal the State does not challenge the use of the informing juror's affidavit, it contends the comments of the jurors "consisted of observations and legitimate deductions made during the trial of the case." It argues that jury comments based upon matter which is before them cannot be grounds for granting a new trial and to conclude otherwise would result in "a substantial impairment of the jury system."

Courts continually strive to protect the basic right to an impartial jury thereby sustaining the jury system, the very foundation of criminal justice. The law is "always zealous to protect every accused from a jury verdict prejudiced by the taint of extraneous influence." *State v. Kociolek,* 20 *N. J.* 92, at *p.* 96 (1955). As we said in *Wright v. Bernstein,* 23 *N. J.* 284, at *pp.* 294–295 (1957):

"The jury is an integral part of the court for the administration of justice, and on elementary principles its verdict must be obedient to the court's charge based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. The parties to the action are entitled to have each of the jurors who hears the case impartial, unprejudiced and free from improper influences."

See *Panko v. Flintkote Co.,* 7 *N. J.* 55, at *p.* 62 (1951), where we said, "In order that there may be confidence in trial by jury it is necessary that parties are to feel sure that verdicts are based upon an honest consideration of

the evidence and not upon prejudice or sympathy." Though *Wright* and *Panko* involved civil trials, the standards for the jury in a criminal trial cannot be less demanding. See *State v. Rios*, 17 *N. J.* 572, 590 (1955).

Where there are sufficient allegations that the jury's verdict was discolored by improper influences, the trial judge should investigate the truth of the charges so that he may determine whether a new trial is warranted. And it makes no difference whether the improper influences occurred inside or outside the jury room. *Wright v. Bernstein, supra; Panko v. Flintkote Co., supra; Palestroni v. Jacobs*, 10 *N. J. Super.* 266 (*App. Div.* 1950); *Capozzi v. Butterwei*, 2 *N. J. Super.* 593 (*Law Div.* 1949). Though the trial judge cannot examine the thought processes of jurors in reaching their verdict, he can receive jurors' evidence as to the existence of conditions or the occurrence of events to determine whether they showed an adverse prejudice bearing on the verdict. *State v. Kociolek, supra,* 20 *N. J.,* at *p.* 100; see Note, 56 *Colum. L. Rev.* 952 (1956).

In the present case the trial judge decided to set aside the jury's verdict and order a new trial after a hearing and full consideration of the affidavits and statements of the jurors. Because of the delicacy of the questioning of jurors, we think the proper practice would be for the trial judge to take the testimony of the jurors himself in the presence of counsel, rather than expose jurors to questioning by others. See *Wright v. Bernstein, supra,* 23 *N. J.,* at *p.* 297; *Palestroni v. Jacobs, supra,* 10 *N. J. Super.,* at *p.* 276. Moreover, he will be in a better position to pass upon the merits of the allegations. However, since the parties agreed to the procedure followed by the trial judge, and the State does not dispute the truth of the initial affidavit in the question involved in this appeal, we need not pursue the matter further.

In any cause pending before him the trial judge has broad power to see that justice is done. While according

due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where he believes the ends of justice so require. *R. R.* 3:7–11. And if he finds a verdict is tainted by prejudice, it makes no difference that evidence which was presented at the trial brought this prejudice to the surface.

■ Motions for a new trial "are addressed to the sound discretion of the court; and the exercise of the discretion will not be interfered with on appeal unless a clear abuse of it is shown." *State v. Smith,* 29 *N. J.* 561, 573 (1959); *State v. Bunk,* 4 *N. J.* 482, 485 (1950).

■ The trial judge had before him proof that religion was introduced into the jury room. After considering the affidavits and statements he concluded that the remarks belittled the integrity of all adherents to the Jewish faith and exhibited an adverse prejudice in the jury's deliberations. Other jurisdictions have recognized that remarks of a juror evincing racial or religious bias are grounds for impeaching the jury's verdict. In *Commonwealth v. Thompson,* 328 *Pa.* 27, 195 *A.* 115 (*Sup. Ct.* 1937) the court said a remark by a juror disparaging Negroes generally would show disrespect for defendant's race and render the juror incompetent and void the verdict. In *Evans v. Galbraith-Foxworth Lumber Co.,* 31 *S. W. 2d* 496 (*Tex. Civ. App.* 1929) one of the parties was Jewish. The court held anti-Semitic remarks of one juror during the jury's deliberations were grounds for granting a new trial. It said, "The verdict of the jury should have been set aside by the trial court on the motion for new trial because of the feeling and racial prejudice displayed by the juror Young during the deliberation of the jury upon its verdict." *Id.,* at *p.* 500. See *People v. Leonti,* 262 *N. Y.* 256, 186 *N. E.* 693 (*Ct. App.* 1933); see also *Impeachment of Jury Verdicts,* 25 *U. Chi. L. Rev.* 360, 369 (1958); 15 *Texas L. Rev.* 101, 106 (1936). If the trial judge found even one juror was so biased as to prevent him or her from objectively weighing the evidence, it was sufficient

to set the verdict aside. See *Panko v. Flintkote Co., supra,* 7 *N. J.,* at *p.* 61.

The trial judge did not examine the affidavits and statements in a vacuum; he viewed them against the backdrop of the entire case. Several grounds for granting a new trial had been advanced. He considered the injection of religion was "one more facet added to the whole complexity of this situation." We cannot overlook the factor that the judge who presided at the trial and the hearing was in a better position than this court, which sees only the cold record, to appraise the entire situation and determine whether the defendant's basic rights were violated. As we have stated, our concern is whether the trial court abused its discretion in setting aside the verdict and granting a new trial. In the absence of such abuse, we do not substitute our judgment for that of the trial court. See *Natale v. Automobile Finance Co.,* 133 *N. J. L.* 253, 255 (*E. & A.* 1945). Since the trial judge could find, as he did, that the element of religious prejudice had contaminated the jury verdict, we hold he did not abuse his discretion. It is unnecessary for us to consider whether any other ground, standing alone, was sufficient to warrant the granting of a new trial.

Certain improprieties which occurred during the trial of this case require our comments to insure that they will not recur in future proceedings. The defendant called a psychiatrist, Dr. Hiram Yaskin, as a witness. In spite of the objections of the Prosecutor, Dr. Yaskin was permitted to testify that based on his examination of the defendant, "this man was perfectly sane and had no psychiatric deviations." On recross examination, the Prosecutor, allegedly to refute the earlier testimony which he contends should have been excluded, entered into the following colloquy with Dr. Yaskin:

"Q. Dr. Yaskin, did you examine Dr. Levitt by using sodium Amytal? A. No, sir.

Q. If you had examined him with the use of sodium amytal, is it probable that you could have ascertained whether or not he had committed this act? A. There is that probability that a definitive affirmation or knowledge on his part might have come out under sodium amytal."

While these questions were highly improper, defendant made no objection. In his summation, the Prosecutor again referred to the absence of a sodium amytal test. He said:

"Now, I asked him a very crucial question right after lunch. I said, 'Doctor, if you had administered sodium amytal to Dr. Levitt, is it probable that you could have ascertained whether this act took place,' and his answer was yes, not possible that it could have taken place. Probably he could tell us whether it actually did happen. He was never asked by Dr. Levitt to do that. This is the important case. It is important to him, but if something is important and you are innocent, you can bring in the proof to show that you are innocent, and he had retained Dr. Yaskin's services and Dr. Yaskin could have administered sodium amytal and he could have sat right on the witness stand and said, in my professional opinion this man did not commit this act. But, he was not asked to use sodium amytal. There can be only one conclusion as to the reason he was not asked."

The defendant requested that the court instruct the jury as follows:

"The jury is instructed to disregard the argument of the Prosecutor with respect to the use of sodium amytal or the failure to use the same."

The court rejected the request and instead charged:

"I further call to your attention there was no test given with the administration of sodium amytal and, of course, you have no right to speculate inasmuch as there was no test. You have a right to consider the answer given by Dr. Yaskin with respect to probability, but keep in mind the fact that no test was ever administered. Therefore we do not in fact know what the result would be."

In *State v. Sinnott*, 24 *N. J.* 408 (1957) the defendant, charged with an act of sexual deviation, sought to have a psychiatrist, voluntarily engaged by him, testify that the

defendant was normal, that he did not have a propensity to commit the alleged offense. The psychiatrist in *Sinnott* was basing his conclusions on limited observations of the defendant. This court held that such testimony was inadmissible. In the present case, Dr. Yaskin's examination of Levitt was of limited extent. The purpose of his testimony was to show an absence in the defendant of deviational traits. Under *Sinnott* the Prosecutor's objection to the admission of such evidence should have been sustained.

■ In order to counteract this improper evidence, the Prosecutor in his summation commented upon the fact that no sodium amytal test was administered to defendant. Sodium amytal is a drug popularly called "truth serum." *People v. Ford*, 304 *N. Y.* 679, 107 *N. E.* 2d 595 (*Ct. App.* 1952). Under the present state of scientific knowledge, testimony elicited from a person while he is under the influence of a "truth serum" type drug is inadmissible. *State v. Sinnott, supra*, 24 *N. J.*, at *p.* 423; *People v. Ford, supra; Henderson v. State*, 94 *Okl. Cr.* 45, 230 *P.* 2d 495, 23 *A. L. R.* 2d 1292 (*Cr.* 1951); Dession, Freedman, Donnelly & Redlich, "Drug-Induced Revelation and Criminal Investigation," 62 *Yale L. J.* 315, 342 (1953). Neither the defendant nor the State could introduce the results of a "truth serum" test in evidence even if defendant had been given such a test. Therefore, it was improper for the Prosecutor to tell the jury the defendant could have shown his innocence if he had asked Dr. Yaskin to administer a sodium amytal test. Such comments are inadmissible even under the guise of refuting the improper testimony introduced by the defendant. See *Berger v. United States*, 295 *U. S.* 78, 55 *S. Ct.* 629, 79 *L. Ed.* 1314 (1925).

Defendant urges other points as grounds for sustaining the trial court's order. We feel there is no need to comment upon them as the questions they present probably will not arise at the retrial.

The order of the trial court is affirmed.

HALL and HANEMAN, JJ., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.