**People of the State of Illinois, Plaintiff-Appellee, v. Virginia L. Seipel, Defendant-Appellant.**

**Gen. No. 10,981.**

Fourth District.

April 24, 1969.

Rehearing denied June 20, 1969.

Thomas F. Londrigan, of Springfield, for appellant.

Raymond L. Terrell, State's Attorney of Sangamon County, of Springfield (Richard A. Hollis, First Assistant State's Attorney, of counsel), for appellee.

SMITH, J.

Defendant was convicted of voluntary manslaughter in the killing of her husband and was sentenced to serve 3 to 10 years in the penitentiary. In this court, the defendant makes five assignments of error: (1) That the conduct of the trial judge deprived the defendant of a fair trial and due process of law, (2) that the State offered no credible evidence to rebut evidence of the defendant's insanity at the time of the shooting, (3) having permitted the defendant to plead guilty to the charge of involuntary manslaughter and then thereafter to withdraw such plea, it was error to deny that plea as a bar to a subsequent indictment charging murder, voluntary manslaughter and involuntary manslaughter (4) the trial court erroneously ruled on instructions and (5) the trial court abused its discretion in denying probation.

It is apparent from this record that the court ran a "tight" or firm court, both evidentiarywise and otherwise. We note from the record that on two occasions the trial court admonished counsel (1) to keep his voice down and (2) to hold his temper. On another occasion outside the presence of the jury, the court observed that it was a hot day and the fourth day of the trial and tempers sometime flair. The philosophy of court and counsel on the conduct of the trial were polls apart. We have carefully read the record in this case. It does not justify the characterizations of judicial conduct contained throughout the brief nor are such characterizations helpful to this court in resolving any issues presented by this record.

■ The defendant shot and killed her husband with a 25-caliber gun at her home around 8:00 p. m. on October 11, 1966. Her defense was insanity. The record estab-

lishes that she was a woman 41 years of age, in her menopause, had been estranged from her husband for about a year and one-half, and was struggling with emotional and psychological problems. In August of 1965, she was hospitalized with suicidal tendencies. She obtained a job as a switchboard operator in the spring of 1966, became more and more nervous at the job and upset at her husband's telephone calls, quit work in June and was again hospitalized. Between August of 1965 and October 11, 1966, she saw some half-dozen doctors and psychiatrists. They all prescribed medication. Her psychiatrist treated her in July of 1966 and discharged her from the hospital on July 8. She did not return to him for further treatments, but saw two other doctors and was hospitalized on September 29, for "anxiety-state." She had obtained a position in the Driver's License Division of the Secretary of State's office and returned to work on October 10. On October 11, she was administered 1/8 cc. of dicurin. Her conduct during the day was testified to by lay people as normal. Her sisters listened to an argument between the defendant and her husband and testified that he was cursing and she was crying. They heard two shots, ran for help, entered the house, she was standing with the pistol in her hand and her husband was lying on the floor near the davenport with two revolver wounds. Her relatives and police officers testified that she was hysterical, talking loudly and gasping and was taken to the psychiatric division of St. John's Hospital by the sheriff's office where she was under twenty-four-hour-a-day surveillance. She did not speak, she did not move, and she did not eat. On October 13, sodium amytal was administered by her treating psychiatrist and he interviewed her. Later the same morning, the assistant State's Attorney interviewed her and this interview was transcribed. Most of the heat and controversy between counsel and the court arose over what evidence was admissible and whether or not the

387

statements taken under sodium amytal were admissible. It was the position of the defendant that the involuntary disclosures made by her while under the influence of sodium amytal were admissible in evidence and denial thereof took from the jury the opportunity to use such statements as a factual basis for "a finding that she was not legally responsible for the acts at the time they were committed." The defendant states that this is contrary to the majority rule in the United States citing a California case and the case of People v. Esposito, 287 NY 389, 39 NE2d 925. Esposito refused to pass on this point and was not followed by the New York Court in People v. Ford, 304 NY 679, 107 NE2d 595. The majority of the court held that in a case of first degree murder, where the accused's mental capacity for premeditation was in issue, a doctor who expressed an opinion that the accused did not have such ability was properly prevented from testifying as to the test of defendant made while the defendant was under the influence of sodium amytal. Published is the dissenting opinion of two judges who took the position that this was error for the reason that having expressed an opinion the jury was entitled to all of the facts upon which the doctor based his opinion. It is sufficient to say that the view expressed in that dissenting opinion is not the law of this State and, parenthetically, it ought not be for the reasons stated in People v. Myers, 35 Ill2d 311, 220 NE2d 297. In ruling on the defendant's offer of proof in our case, the trial court said:

> "If the doctor feels that it is necessary in order to properly probe this person's mind to inject a serum and to listen to her response to questions, I will permit him to testify that he did so; and will permit him to testify about doing it up to the point where he starts to quote her.

"I will not permit this witness or any other witness to testify on this point, nor allow the statement to be introduced for that."

This ruling is squarely in keeping with the Supreme Court's statement in Myers that "there is nothing to indicate that defendant's responses while he was under the influence of sodium pentothal [amytal] were necessary for the jury to understand the psychiatrist's findings or opinion based upon such examination. It was not error for the trial court to exclude testimony concerning defendant's responses while under the influence of the sodium pentothal." The defendant cites People v. Heirens, 4 Ill2d 131, 122 NE2d 231, and People v. Haun, 71 Ill App2d 262, 217 NE2d 470, as supporting her theory. These cases fall far short of authority that statements made under the influence of sodium amytal are admissible and neither so holds. We perhaps ought to say that even if they did, they would be controlled on the precise point by People v. Myers and the trial court followed People v. Myers. Certiorari in Myers was denied by the United States Supreme Court in 385 US 1019, 17 L Ed2d 557, 87 S Ct 752. Ill Rev Stats 1965, c 38, § 158–1, forbids a court "in the course of any criminal trial . . . [to] require, request or suggest that the defendant submit to a polygraphic detection deception test" or to the truth drugs. In People v. Nelson, 33 Ill2d 48, 210 NE2d 212, certiorari denied, 383 US 918, 15 L Ed2d 671, 86 S Ct 911, the Supreme Court stated that a polygraph operator's opinion as to the truthfulness of a lie detector subject had never been recognized by the court as admissible evidence on the issue of a defendant's guilt or innocence. This follows the statute just quoted and we see no persuasive distinction between the application of that statute and its principles to statements made by one under the influence of truth drugs. In the face of Myers and of the statute, it is clear that both the courts and the legislature

have some dubiety about the probative value of statements made under such circumstances and the danger of relating them for any purpose. We share that same view.

■■ The treating psychiatrist was asked whether or not the defendant at the time of the shooting as a result of mental disease or defect lacked substantial capacity to appreciate the criminality of her conduct. Answering in the affirmative, the doctor stated, "I don't think the defendant could conform her conduct to the requirements of the law. My basis is stated in the reasons I gave before. The drug she was taking, her basic personality and as to her state of mind, her senses were numb." He had previously given a complete and detailed analysis of her personality, her hysteria, her use of the various drugs prescribed by the other doctors and their effects upon her, his suspicion that she had taken more of the drugs than the doctors had prescribed, and included in his opinion some of the information concerning the drugs that he had obtained from her during the sodium amytal interview. In rebuttal, the State called some lay witnesses and a psychiatrist to whom was prepondered a hypothetical question. Based on that hypothetical question, that doctor stated that it was his opinion that "she has the capacity to know the criminality of her acts. In my opinion, she had the ability to conform to the law." No objection was made to the hypothetical question and in cross-examination, the doctor stated that his opinion was based on the facts stated in that question. The question of insanity having been raised, it then became the burden of the People to establish that the defendant had substantial capacity to appreciate the criminality of her conduct. Upon the record we now review, this was a question of fact for the jury and we see little reason on this record to disagree with their conclusion that the State maintained its burden of proof beyond a reasonable doubt.

■ ■   On October 13, the defendant was charged with murder. Thereafter, an information was filed charging the defendant with involuntary manslaughter and she pleaded guilty and asked for probation. Considerable opposition developed to the granting of probation and the defendant moved to withdraw her plea of guilty on the grounds of newly discovered evidence and informed the court that the defense would be insanity at the time of the occurrence. This motion to withdraw her waiver of indictment and her plea of guilty to the information was allowed. The information charging involuntary manslaughter was abandoned. Thereafter, the Grand Jury returned a seven-count indictment charging murder, voluntary manslaughter and involuntary manslaughter. The defendant now contends that under the compulsory-joinder provisions of Ill Rev Stats 1965, c 38, § 3–3, the prosecution for voluntary manslaughter upon which the defendant was convicted is barred. Simply stated, they assert that the State cannot elect to commence prosecution on a lesser offense based on the same act, solicit a plea of guilty and then prosecute the defendant for a greater offense, if such plea is vacated. It seems to be the position of the defendant that the statute places the burden on a prosecutor to either irrevocably elect the charge on which he desires to proceed or to proceed on all charges growing out of the same conduct. People v. Mullenhoff, 33 Ill2d 445, 211 NE2d 744. The defendant flies squarely in the face of the statute which bars the prosecution only if there is either a conviction or an acquittal or a determination that the evidence is insufficient to warrant conviction on the first trial. In People v. Miller, 35 Ill2d 62, 219 NE2d 475, the Supreme Court held that a mistrial did not constitute a conviction nor acquittal which would bar a subsequent prosecution. By the same token, permitting the defendant to withdraw her plea and her waiver of indictment left her neither convicted nor acquitted of the

391

charge. Defendant argues that there is some basic unfairness in permitting multiple prosecutions and that under the circumstances here, the prosecutor is confined to the prosecution for involuntary manslaughter upon which he originally elected to proceed. We submit a fair trial applies as well to the prosecution as it does to the defendant. The defendant cites People v. Haycraft, 76 Ill App2d 149, 221 NE2d 317. The problem presented in Haycraft is not remotely present in the case at bar. In that case, a probation officer, testifying before a jury after a withdrawal of a plea of guilty and relating a conversation with the defendant, stated "I asked him if he performed the act and since he had already pled guilty at that time, etc." It was there pointed out that a plea of guilty subsequently withdrawn is not admissible in evidence against an accused upon his trial on the substituted plea of not guilty and even though the court directed the statements stricken and the jury was told to disregard it, the harm was done. The cause was reversed and remanded for a new trial. In the context of our case, there is no evidence that the jury was at all aware of the former plea of guilty to involuntary manslaughter and the alleged problem becomes purely fictional imagination. To hold that the prosecution is now bound by his election to file the information is squarely contrary to the provisions of the statute. There is little doubt that the prosecution would have carried on under the plea of guilty, but this wasn't to the defendant's liking and she decided to take another tack. Having withdrawn her plea of guilty with the acquiescence of the People, she effectively scuttled the then pending information charging her with involuntary manslaughter. Haycraft squarely holds that having done so, that proceedings is a nullity and without utility for any purpose. The present prosecution is not barred through any proper concept of fairness nor for any of the reasons stated in the statute.

On the issue of self-defense, the State tendered an instruction as follows:

> "The court instructs the jury that a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.

> " 'Reasonably believes' means that the person concerned, acting as a reasonable man, believes that the described facts exist."

Complaint is made of this instruction on the ground that it does not properly advise the jury of the defendant's condition and state of mind in determining what was reasonable or apparent to her. Defendant offered three instructions on the same subject. The first instruction told the jury that the right of self-defense does not depend upon the correctness of the slayer's apprehension of apparent danger, that he might act upon appearances and use deadly force if he had reasonable grounds to believe and does believe that such killing is necessary to save himself from death or great bodily harm although in retrospect it may turn out that the appearances were false or that he was mistaken as to the extent of the actual danger. The second instruction stated that one confronted with danger or assaulted is not obliged to use the same mature judgment and consideration that persons otherwise not confronted with sudden danger are required to use, but may act upon appearances and if he misinterprets, misunderstands or makes a mistake about the appearances, he is not criminally liable. The third instruction is that where a person is in a place where he has a lawful right to be and is unlawfully assaulted and put in apparent danger of his life or great

393

bodily harm, he doesn't have to escape, but may stand his ground and meet force with force and use deadly force if necessary or apparently necessary. When the deputies arrived the defendant told them that as she entered the house that evening, it was dark and someone knocked her sprawling, that they wrestled over the gun and it went off. This testimony would support an accidental shooting rather than self-defense. Later after the shooting and after she was out of the hospital, the defendant told two witnesses that this gun was normally kept in the bedroom, but that she took the gun from the bedroom and put it behind a plant on the TV. She also told two witnesses that as he got up from the davenport, she shot him. The two sisters stood outside the house for about five minutes. All they heard was profane language on the part of the decedent and crying on the part of the defendant. One sister left, the other remained and in a matter of three or four minutes, two shots were fired. The evidence is also in dispute about whether or not the decedent came to the house as a result of his call to her or of her call to him. The evidence is also clear that on previous occasions the decedent had struck the defendant. We entertain some doubt as to whether or not there is a factual situation in any view of the evidence which justifies the giving of the self-defense instruction. There are no facts which point directly to an apparent necessity for her to shoot the decedent. There are no facts from which we can conclude that it appeared to her to be reasonably necessary or apparently necessary to shoot and kill the decedent. Neither sister testified as to any struggle, but only to foul and profane language and crying. The instruction given was in the language of the statute and was doubtless given because the defendant in her opening statements stated that one of the defenses would be self-defense. We see no error in this record in giving the instruction in the basic language of the statute.

To have instructed upon whether or not it was apparently necessary for her in her own self-protection to kill the decedent would patently have presumed a present fact from past conduct without present evidentiary support. Indeed the defendant abandoned the argument of self-defense in closing arguments and now states that it was because of the court's ruling on instructions. The defendant in closing arguments stated:

> "The law of self-defense is that a person must be reasonable in their use of force. They must be apprehensive of death or great bodily harm.

> "Now, I think the history is such, and I think this will bear it out and the testimony related as to what happened earlier in that night, as she went to the house she was reasonably apprehensive, as a reasonable person—possibly not reasonably apprehensive of death or of great bodily harm, but ask yourselves if she is not reasonable in her self-defense, what was she? Had she done anything reasonable that the State has told you about other than trying to go to work and to conduct her business?

> "I submit to you if her act, the instinctive act to defend herself wasn't reasonable, I say to you although she killed her husband, she did it in an instinctive act of self-defense, which may not be a legal defense, but the defense of insanity is. It is in issue here because of the introduction of the State of those statements and the question of self-defense."

■ We think this was proper argument under the facts in this case and that the issue of apparent necessity was more appropriate coming from the attorneys in argument than for the court to have incorporated that element into his instruction without evidentiary support. The jury was adequately and properly instructed.

■ The defendant's point that the trial court abused his discretion in refusing probation in this case is based upon defense counsel's philosophy of what the law ought to be rather than the court's philosophy of what the law is. There was considerable opposition to probation. This was well known to the defendant and indeed appears to have been a prominent reason for the withdrawal of her plea of guilty to the information charging involuntary manslaughter. Probation, a privilege but not a right, was properly denied. There was no abuse of discretion.

■ ■ The defendant complains of the rebuttal argument of the State's Attorney in which he said ". . . he did nothing to threaten the life of her, absolutely nothing. And had it been so, I am sure you would have heard it. Let me remind you, ladies and gentlemen, there is no evidence here that this deceased did anything to that woman that day or that night." The defendant cites People v. Kostos, 21 Ill2d 496, 173 NE2d 466, and People v. Wollenberg, 37 Ill2d 480, 229 NE2d 490, as authority for the proposition that this is plain error and that it requires a reversal. It is, of course, axiomatic that the State's Attorney may not in his closing arguments or at any time during the trial comment on the failure of the defendant to testify. It is the application of this rule that causes the difficulty. In this case, no objection was made to such argument and it is excused on the ground that an objection would have only emphasized the argument. We have noted a portion of the defendant's closing argument and it strikes us that this statement by the State's Attorney is properly directed to that argument where reference was made to an instinctive act of self-defense. Neither the physical condition in the room where the incident occurred nor the testimony of the two sisters justified that argument nor is the State's argument in reply prejudicial error. In this record, we think it is a

strained construction of the State's Attorney's argument to charge it with an explicit inferential reference to the fact that the defendant did not testify.

There being no error in this record, the judgment of the trial court is affirmed.

Affirmed.

TRAPP, P. J. and CRAVEN, J., concur.