No. 45,783

STATE OF KANSAS, *Appellee,* v. DALE ALBERT CHASE, *Appellant.*

(480 P. 2d 62)

Opinion filed January 23, 1971.

*Scott E. Jarvis,* of Topeka, argued the cause and was on the brief for the appellant.

*Gene M. Olander,* County Attorney, argued the cause, and *Kent Frizzell,* Attorney General, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: The defendant, Dale Albert Chase, appeals from convictions by a jury of murder in the first degree as defined in K. S. A. 21-401 [now K. S. A. 1970 Supp. 21-3401] and of robbery in the first degree as defined by K. S. A. 21-527 [now K. S. A. 1970 Supp. 21-3427].

The state's evidence shows that James E. Long was killed by two gunshots to the back of the head and robbed on May 15, 1968, in the east part of Topeka. Mr. Long was the driver of a Yellow Cab. Soon after midnight, the morning of May 15, Mr. Long answered a call from the Hotel Jayhawk where defendant and two companions, Kenneth Arthur Roth and Mark DeWitt, were picked up as purported taxi fares.

The following day the taxicab was found in a wooded area partly submerged in a pond near the southeast edge of Topeka. The body of Mr. Long was found nearby.

The events leading up to the criminal prosecution are undisputed and can be stated briefly.

The facts are established by defendant's testimony given in the previous trial of Roth. Defendant's entire testimony on direct and cross-examination, given in the Roth trial, was read to the jury in the instant case. No objection was made to this procedure. Defendant relates the events culminating in the murder and robbery in his testimony, which is narrated in defendant's abstract as follows:

". . . the boys had met at the Topeka YMCA, had gone pilfering automobiles, and then went to the Jayhawk Hotel, where a taxi cab was called. They discussed robbing the cab driver, and Roth stated that the cab driver must be killed. Chase objected to killing the cab driver, at which time Roth, who had earlier been given the gun by Chase, gestured toward Chase and stated that if Chase wanted to 'chicken out', he could be killed, too. The cab arrived and after making at least one error in direction, arrived at the field behind the Hudson School. DeWitt pretended to be getting money to pay the cab driver. The cab driver glanced to the front of the cab, and Roth shot him in the back of the head. Chase shouted, 'Shoot him again', and Roth fired again. Chase shouted 'Shoot him again,' and Roth fired again. Two of the shots apparently struck the cab driver. Roth and DeWitt exited the car and Chase knocked out the interior lights. Roth rifled the pockets of the cab driver, taking $27.11. Chase moved the cab down to the pond, where one of the boys gave it a shove and it went in. As Chase was familiar with the area, he led the boys to a location on the other side of the wooded area where a car that had been stolen several days earlier had been stashed. This car was used to return to the vicinity of the YMCA. Chase took his motor cycle and went home, and after a fitful night, the following morning returned to the scene of the crime. At that time he further wiped down the taxi cab."

Because of the seriousness of the crime charged and the nature of the issues on appeal, we have secured and examined defendant's verbatim testimony. In addition to defendant's testimony narrated in this record, we have learned that he testified that after returning to the YMCA, the three boys divided the money, then Roth gave the gun back to defendant. Defendant hid the gun and a box of cartridges in the garage at his home.

After defendant was charged by information, a commission was appointed to examine defendant. The commission determined that defendant was competent to stand trial.

Thereafter, defendant's trial was commenced on June 2, 1969, and extended through June 4. The principal defense was insanity at the time of the criminal offense and several expert witnesses were called by defendant in support thereof. The defendant also claimed that he was threatened by Roth. The trial court fully instructed

on coercion and voluntariness and there is no complaint made on appeal in this regard.

As previously indicated, the jury returned a verdict of guilty on both charges and recommended a sentence of life imprisonment on the murder charge.

After a motion for a new trial was heard and overruled, defendant was sentenced to the Kansas State Industrial Reformatory for a term of not less than ten nor more than twenty-one years on the robbery charge and life imprisonment on the murder charge. The sentences were directed to run concurrently.

On appeal defendant makes three specifications of error which will be examined in the order presented.

Defendant first contends the instructions given by the trial court did not adequately describe the area of mens rea, general criminal or felonious intent within the context of this case.

In this connection defendant requested the submission of the following instruction:

"In order to find the Defendant guilty of the acts alleged in the Information in this case, you must find not only that he committed those acts, but also that he committed them willfully and knowingly.

"Willfullness implies bad faith and an evil motive. An act is done knowingly if it is done voluntarily and purposely and not due to mistake, inadvertance, or some other innocent reason."

The complete instructions are included in the abstract and have been carefully examined. We believe a recitation thereof is unnecessary. It will suffice to say that intent as an element in each of the offenses charged was carefully explained, and the jury was fully advised concerning the application thereof to the charges in the information. The instructions include definitions of all the terms used in describing intent as applied to robbery and first degree murder committed by a premeditated killing or committed in the perpetration of a robbery or a felony.

The trial court clearly and adequately instructed the jury in regard to the necessary intent to be established by the state. The submission of defendant's requested instruction would have been superfluous.

Defendant next contends the trial court erred in excluding from the jury two video tapes which the defendant says illustrated diagnostic psychiatric techniques used on defendant by Dr. Joseph Satten, a psychiatrist.

The question arose during Dr. Joseph Satten's direct testimony. Dr. Satten testified that he with two other psychiatric physicians were appointed as a commission to inquire into the mental capacity of defendant and to report to the court whether he had any mental illness and whether that mental illness interfered with his capacity to stand trial. Interrogation of Dr. Satten proceeded as follows:

"Q. And what, in general, were the findings of that Commission? A. The commission found that he was mentally ill, but that the mental illness did not interfere with his capacity to stand trial.

"A. I used a particular drug called sodium amytal. That is often helpful in relaxing a patient and getting around mental blocks and sometimes is helpful in recovering memories where there are memory gaps.

"Q. Was this interview recorded in any manner? A. I recorded the interview on audio and video tape as well as the interview immediately before the drugs so I could compare his response with drugs and without drugs.

"Q. Was this recording done as a part of your diagnostic procedure? A. Yes and no. Yes, it was helpful to have a recording so I could go back and look at it the second time. No, I am interested in the research and in being able to compare at a later date recorded interviews of various individuals who have been accused of homicide.

"Q. Were those the only two purposes in recording the interviews at that time? A. Well, there was a third potential purpose, namely, that it might be helpful to the court and jury in explaining my examination and my findings."

Dr. Satten then recited his findings and related the results of his evaluation of the defendant. This portion of Dr. Satten's testimony will be discussed in connection with the next point to be considered in this opinion.

At the close of Dr. Satten's direct examiantion the following appears:

"Q. Dr., at this point, in your opinion, would it be helpful for the court and jury to view the video material that is available in the court room? A. Why, I think it would. I have tried to describe as accurately and as clearly as I can the nature of the examination and my testing and probing to try to get at what was going in his mind. But I think that seeing the real thing, or at least some reasonable sample of the real thing, might give a better picture.

"Mr. Jarvis: Your honor, at this time, then, we would request permission of the court to display this material.

"The Court: How long does this take, Doctor?

"The Witness: There are two sections, one approximately an hour without a drug, and the other approximately an hour and a quarter under the influence of the drug."

At this point, the county attorney objected stating that the video tapes were not the best evidence, the jury was not trained in the evaluation of sodium amytal or psychiatric operations and that the

state could not cross-examine the video tapes. The court recessed and during the noon hour viewed the two video tapes. The trial court described the tapes as interviews with defendant by Dr. Satten concerning the circumstances of the offense and defendant's version of events. The trial court refused defendant's proffer of the tapes, reasoning that by this means the defendant's version of the facts and the circumstances would be shown to the jury without being tested by cross-examination. The trial court further observed that there were issues in the case that went beyond the question of legal insanity.

In his brief on appeal, defendant argues that the offer of the tapes was not to prove the statements made by defendant, but only to strengthen the credibility of Dr. Satten's testimony by illustrating the techniques used in arriving at the conclusions presented to the jury concerning the mental responsibility of the defendant. He further argues that any prejudice to the state would have been fully alleviated by an instruction limiting the jury's consideration.

It is desirable, of course, that the jury be informed about the techniques, tests, and procedures used by Dr. Satten in arriving at his conclusions concerning the defendant's mental responsibility. On the other hand, when evidence such as that offered here is received for a limited purpose, under a proper limiting instruction, there is, nevertheless, danger that the jury may consider it as substantive. From what was said by the trial court in announcing its ruling, it appears the court was fully aware of both the desirability and danger involved in submitting such evidence to the jury.

The question raised by this assignment is one of first impression in this jurisdiction. Neither the defendant nor the state has directed our attention to authority dealing with the subject. However, our research reveals that similar questions have been considered by other courts resulting in a conspicuous diversity of opinion.

In *People v. Cartier*, 51 Cal. 2d 590, 335 P. 2d 114, the defendant, charged with murdering his wife, was examined by a psychiatrist while under the influence of sodium pentathol. The trial court's exclusion of a tape recording of the examination was held erroneous on appeal; since, as the court observed, "The statements made to the psychiatrist by defendant while under the influence of the drug were not offered for the purpose of proving the truth of the matter asserted therein."

On the other hand, testimony pertaining to psychiatric examination of a defendant, while under the influence of sodium amytal, has been flatly rejected in several jurisdictions. ( See *Dugan v. Commonwealth,* [Ky. 1960], 333 S. W. 2d 755; *Merritt v. Commonwealth,* [Ky. 1965], 386 S. W. 2d 727; *State v. Linn,* 93 Idaho, 430, 462 P. 2d 729; and *People v. Ford,* 304 N. Y. 679, 107 N. E. 2d 595.)

Other states have taken what may be labeled a middle ground position. In *State v. White,* 60 Wash. 2d 551, 374 P. 2d 942, ( 1962), a psychiatrist, Dr. G. Charles Sutch, examined defendant while he was under the influence of sodium amytal and desoxgyn. Dr. Sutch, in much the same manner as Dr. Satten in the instant case, testified as to his diagnosis of White's mental condition and was permitted to relate the kind of drugs administered for the purpose thereof and their effect on defendant. The trial court refused to permit Dr. Sutch to relate any statements made by White, while under the influence of the drugs, and rejected a tape recording of the interview. These rulings were assigned as errors on appeal. The Supreme Court of Washington *en banc* held there was no abuse of discretion by the trial court in either ruling, even though the rejected testimony and tape recording were not offered to prove the truth of statements made to the psychiatrist, but only for the purpose of enabling the jury to better understand the basis of the psychiatrist's opinion. The court discussed other authorities, including *People v. Cartier,* supra, and reasoned:

"A layman would find it extremely difficult, if not impossible, to make an accurate evaluation of the testimony which was offered. On the other hand, the possibility that a jury might be confused or misled by such evidence is quite real. Therefore, the trial court could have concluded that whatever dubious value such testimony might have would be more than outweighed by the danger of its misinterpretation and misuse by the jury. . . ." (p. 568.)

In *People v. Myers,* 35 Ill. 2d 311, 220 N. E. 2d 297, a tape recording was not involved, but in affirming the trial court's rejection of a psychiatrist's recitation of the responses of the accused, while under the influence of sodium pentathol, which was offered for the purpose of explaining techniques, the court said:

". . . There is nothing to indicate that defendant's responses while he was under the influence of sodium pentathol were necessary for the jury to understand the psychiatrist's findings or opinion based upon such examination. It was not error for the trial court to exclude testimony concerning defendant's responses while under the influence of sodium pentathol." (p. 333.)

The decision in *Myers* was adhered to and additional authorities reviewed in *People v. Seipel,* 108 Ill. App. 2d 384, 247 N. E. 2d 905, wherein sodium amytal was administered.

We believe the treatment of the problem by the Washington and Illinois courts to be sound and fair to both the state and the accused and applicable to the issue in the context presented herein. Dr. Satten carefully and articulately explained his purpose in administering the drug, its effect on defendant and the benefits derived in evaluating defendant's mental condition. No complaint is made and we find nothing in the record to indicate that Dr. Satten's testimony was restricted in this regard.

We find no abuse of discretion by the trial court in refusing to admit the video tapes.

Finally, defendant contends the state did not meet the minimal required quantum of proof concerning defendant's mental responsibility in view of defendant's evidence in this regard.

In order that this assignment be viewed in proper perspective, it should be pointed out that there was no challenge made to the court's instruction concerning the defense of insanity. The instruction given is identical with that approved in *State v. McBride,* 170 Kan. 377, 226 P. 2d 246, and is essentially the same as that approved in *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, cert. den. 368 U. S. 868, 7 L. Ed. 2d 65, 82 S. Ct. 80. As explained in the *Andrews* opinion, it is generally in conformance with what is commonly denominated the M'Naghten Rule. The instruction further directed the jury that the burden is upon the state to prove to the jury's satisfaction beyond a reasonable doubt the defendant's sanity, as that term was defined, at the time of the shooting in accord with the law of this state since *State v. Crawford,* 11 Kan. * 32(1873). (See *State v. McBride,* supra.)

The instruction referred to is quoted in full in the *McBride* and *Andrews* opinions and need not be restated here.

The gist of defendant's argument is that, since he called as witnesses in his behalf a battery of experts who unanimously agreed defendant had suffered some degree of mental illness throughout most of his life, the issue of insanity was conclusively resolved leaving no question for the jury's determination. It is true, the record shows the extraordinary circumstance that the mental health of this defendant has been under some degree of medical and scientific observation since the early age of twenty-eight weeks. This cir-

cumstance came about by reason of defendant's participation as one of the subjects of a research project conducted by the Menninger Foundation. We are not informed as to why or how defendant was selected as a subject.

Dr. Alice Moriarty, a research psychologist, described the project as a "longitudinal research project" commenced in 1950; that the project was a continuing one, along with a "longitudinal time continuum." Dr. Moriarty testified that, as part of the research project, defendant was seen at the age of twenty-eight weeks and subsequently at the age of four, seven, eleven, twelve, fifteen and seventeen, and that he was tested on each occasion. The record does not disclose the nature of the tests. She described defendant's childhood as "difficult and disturbed" and "that his homelife was rather aberrative."

Concerning defendant's mental condition at the time of the offense, Dr. Moriarty testified that on an intellectual level defendant was potentially capable of distinguishing right from wrong; that he was bright enough to do so, "but that emotionally he was not able."

The sum of the evaluations of defendant's other experts is essentially the same as that expressed by Dr. Moriarty.

Dr. Donald Offutt, a psychiatrist, who had treated defendant for a short period described his mental condition in these words:

"Chase would have the capability on a purely intellectual level to know that an act was not in best interest; however, on an emotional and instinctual level, he would act impulsively. . . ."

Defendant relies heavily on the testimony of Dr. Joseph Satten, Director of the Division of Law and Psychiatry of the Menninger Foundation. Dr. Satten drew together all prior information concerning defendant, including prior diagnostic efforts and the reports of other doctors. As we have noted, Dr. Satten was also a member of the commission which found defendant able to stand trial.

Dr. Satten summed up his careful and thorough description of his exhaustive consideration of the case by stating in substance that defendant had no appreciation of values of right or wrong in the philosophical sense that a normal person might, that defendant's symptoms added up to what might be called a personality disorder or character disorder to which was added a label of infantile personality disorder, which suggests a primitive quality of mental functioning.

On cross-examination Dr. Satten testified that if defendant were tested concerning the right or wrong aspects of robbery, murder or burglary, "The chances are that he would put 'wrong' on each one of those."

It is obvious that the fact of defendant's affliction with a personality disorder or mental illness was established by the testimony of Dr. Satten and defendant's other experts. However, Dr. Satten does not specifically interpolate his evaluation of defendant's mental condition into the terms of the legal test set out in the court's instruction. In other words, Dr. Satten's testimony, as we see it, was a careful recitation and explanation of discernible symptoms of mental illness bearing upon defendant's mental capacity, but the door was left open for the ultimate determination by the jury, whether defendant was capable of distinguishing between right and wrong at the time, and with respect to the act committed. (See *Fisher v. Fraser,* 171 Kan. 472, 233 P. 2d 1066, 29 A. L. R. 2d 699.) None of the experts in the instant case put their conclusions in terms of legal insanity as was done in *State v. Sagebiel,* 206 Kan. 482, 480 P. 2d 44.

The defense of insanity is authorized in this state by K. S. A. 1969 Supp. 62-1532 [now K. S. A. 1970 Supp. 22-3428]. Under the provisions of that statute we have repeatedly held that the question of sanity of the accused, at the time of the alleged commission of the offense, is one to be determined by the jury upon the evidence introduced bearing upon the issue. The most recent decisions are *State v. Sagebiel,* supra; *State v. Coltharp,* 199 Kan. 598, 433 P. 2d 418; and *State v. Mendzlewski,* 180 Kan. 11, 299 P. 2d 598. Cases from other jurisdictions, in line with our decisions, are noted in *Coltharp* and *Mendzlewski.* (See, also, 17 A. L. R. 3d, Anno., Insanity-Proof, §§ 7, 8, pp. 179, 184.)

The attitude of this court stems from the philosophy that medical science is not recognized as an exact science, and has not developed to the extent that it can diagnose human ailments with the exactitude of the mathematician; that necessarily, there is an element of uncertainty and speculation in the formation of expert opinion on the mysterious functioning of the human body. Expressions of this court in dealing with the subject, in both civil and criminal cases, are discussed and cases cited in *State v. Harden,* 206 Kan. 365, 480 P. 2d 53, this day decided.

The rule of this court with respect to the determination of the issue of insanity is consistent with views expressed by Dr. Karl Menninger, one of the nation's most eminent authorities on legal aspects of psychiatry. In his recent book "The Crime Of Punishment," Dr. Menninger proposes the elimination of courtroom appearances by psychiatrists on the issue of guilt because, as he writes:

". . . I consider guilt, competence, and responsibility to be moral questions, not medical ones. The judge and the jury are the community's representatives in this area. It is for them to make the judgment and apply the sanctions deemed appropriate, not us psychiatrists. Society decides— through them—what crime is and what proof it requires in any particular instance and what penalty applies." (p. 139.)

With respect to the proper function of a psychiatrist in this area, Dr. Menninger makes this further observation:

". . . They [psychiatrists] may certainly examine an offender and submit a report of their findings, and these findings may assist a judge or a jury to come to some conclusions about the man's competence. But no psychiatrist should presume to accept the responsibility of deciding a highly technical legal question based on these findings. He can say that a man is distracted or deluded or hallucinated, but whether or not this state of mind is compatible with legal 'competence' is something about which a psychiatrist has only common knowledge, and not scientific knowledge." (p. 141.)

Associate Justice William O. Douglas of the United States Supreme Court, in a commentary favoring the Durham Rule (*Durham v. United States*, [District of Columbia Circuit] 214 F. 2d 862, cert. den. 364 U. S. 854, 5 L. Ed. 2d 77, 81 S. Ct. 83), appearing in Vol. 41 of the Iowa Law Review [No. 4, 1956], expresses views concerning the function of psychiatrists in keeping with those of Dr. Menninger. Justice Douglas says:

". . . The psychiatrist merely expounds on the theoretical and clinical aspects of the problem. The jury evaluates his testimony, as it does the evidence on every other factual issue. That is the correct disposition, for the question whether society should assess punishment for criminal conduct is, in the last analysis, a moral judgment. The jury, being of the community, reflects its attitudes and speaks for it. . . ." (pp. 489, 490.)

In *Dusky v. United States*, 295 F. 2d 743 (8th Cir. 1961), the United States Circuit Court of Appeals was confronted with an issue concerning the sufficiency of the prosecution's evidence on the question of insanity in a frame of reference quite similar to that before us herein. Appellant Dusky had a considerable history of

medical and psychiatric treatment and had undergone a series of psychological tests. Psychiatric diagnosis was to the effect that Dusky was suffering from schizophrenia on the date of the offense and probably did not know the difference between right and wrong. The prosecution, as in the instant case, offered no expert testimony in rebuttal, but relied upon lay testimony and lay facts. In holding the evidence sufficient to take the question to the jury, Circuit Judge Blackmun (now Associate Justice of the United States Supreme Court) speaking for the court said:

". . . We cannot conclude, as we must in order to remove this case from the jury's consideration, that on the basis of the evidence here 'reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and that reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime.' . . ." (p. 756.)

Further in the opinion, by way of reply to appellant, who urged cases holding to the contrary, the following appears:

"We recognize that these cited cases involve situations, as does the present one, where expert testimony is introduced on behalf of the defendant and where usually the opposing prosecution material consists at the most of lay evidence. But that common feature does not in itself justify any general legal conclusion that the defense is then always entitled to a judgment of acquittal, or that the cases cited above in paragraph 3 are not authoritative. There is nothing essentially sacred or untouchable in expert testimony. The mere fact that the primary evidence on one side may be typified as expert in character while that on the other is exclusively from the mouths of lay witnesses and from lay facts must not of itself serve to destroy the jury's traditional function." (p. 757.)

This court has consistently rejected the rule which would treat medical testimony as conclusive, merely because it is not disputed by other medical testimony. (*State v. Harden,* supra; *State v. Sagebiel,* supra; and *State v. Mendzlewski,* supra.)

We believe the jury should be free to make an independent analysis of the facts on which the opinions of the experts rest. If we were to accede to defendant's argument that the jury was not competent to pass on defendant's mental condition, because of the expert testimony, we would be transferring the jury's function to the psychiatrist and substituting a trial by experts for a trial by jury. To adopt the theory urged by defendant, we would be forced to overturn this court's well-established concept of the jury's function. Furthermore, we would force responsibility upon the expert which, according to recognized authorities in their own profession,

is neither sought nor deemed to be the prerogative of psychiatrists when called upon as expert witnesses to assist in making the determination in judicial process.

In the instant case there was much more for the jury's consideration than just the analysis of the expert testimony.

The jury had before it in the defendant's own words, an account of his conduct before, during and following the act committed. The jury was entitled to consider physical evidence consisting of the gun, the taxicab, the stashed car, which corroborated the defendant's clear recollection of the events that took place before, during and after the shooting. The jury had a right to consider that defendant had stashed the stolen get away automobile, furnished the gun, which he later hid, and returned to the scene the following morning to wipe fingerprints from the taxicab. All of these undisputed facts relate to the issue whether defendant understood the nature and quality of his acts, at the time he committed them, and whether he understood they were wrong. This evidence was weighed by the jury, under the guidance of the court's instructions against the evidence of the nature of defendant's mental illness and his mental capacity as described by his expert witnesses.

In this state, as we have noted, when evidence is introduced in support of a plea of insanity at the time of the offense, the burden of proof beyond a reasonable doubt on the issue, falls on the prosecution as in the case of any other necessary ingredient of the offense charged. Likewise, the test, on appellate review, of the sufficiency of the evidence to support the verdict is the same as that applied with respect to any other element of the offense.

The test referred to is stated in our holding in *State v. Helm,* 200 Kan. 147, 434 P. 2d 796. We held:

"In a criminal prosecution it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before a verdict of a jury which has been approved by the trial court may be set aside on appeal on the ground of insufficiency of evidence, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the trial court." (Syl. ¶ 2.)

See, also, *State v. Sagebiel,* supra; and *State v. Paxton,* 201 Kan. 353, 440 P. 2d 650, cert. den. 393 U. S. 849, 21 L. Ed. 2d 120, 89 S. Ct. 137.

In the instant case the learned trial judge received the report of the sanity commission, heard and observed firsthand all of the evi-

dence, approved the jury's verdict and overruled defendant's motion for a new trial. In order to strike down the jury's verdict and the trial court's approval thereof, as we are asked to do, we would be compelled to conclude that reasonable men must necessarily possess a reasonable doubt as to the defendant's legal sanity at the time of the offense. After a careful examination of all the evidence within the context of the applicable rules, we are unable to so conclude.

In his brief on appeal, defendant strenuously argues that the case of *Phillips v. United States,* 311 F. 2d 204 (10th Cir. 1962) fully supports his position and requires a reversal.

The *Phillips* case has been urged upon this court in two other recent cases. (*State v. Coltharp,* supra; and *State v. Sagebiel,* supra.) In each case application of the rule announced in *Phillips* was rejected.

In the *Phillips* opinion the court summarizes the appellant's evidence, which consisted of the testimony of two psychiatrists and two relatives of appellant. The diagnosis of Phillips's condition at the time of the alleged offense was "schrizophrenic reaction, undifferentiated type, chronic."

The court stated the government offered no evidence or testimony bearing on the mental competency of the accused, and thus failed to sustain the burden of proof. No mention is made of any lay testimony or lay facts concerning the conduct of accused nor does the court relate how the facts of the offense were established.

Insofar as the holding in *Phillips* stands for the proposition that expert testimony submitted by accused, tending to prove insanity may only be rebutted by expert testimony offered by the prosecution; it was rejected in *Coltharp* and *Sagebiel* and is again rejected here. If the opinion be construed to hold that relative lay testimony or lay facts have no bearing on the mental capacity of an accused then, likewise, the *Phillips* holding is in conflict with the long line of decisions of this court previously mentioned.

Finding no error, the judgment is affirmed.

FATZER, J., not participating.