**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2664-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AARON ENIX,

     Defendant-Appellant.

_____

Submitted March 2, 2022 – Decided March 21, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment Nos. 16-08-1102 and 17-04-0267.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Steven K. Cuttonaro, Deputy Attorney General, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Aaron Enix appeals from his conviction and sentence. Enix and co-defendant Davon Cooper were tried together before a jury. The jury found Enix guilty of murder, N.J.S.A. 2C:11-3(a)(1), (2), second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1). The trial judge sentenced him to an aggregate fifty-five-year term, subject to the parole ineligibility imposed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. After reviewing the record, we discern no legal basis to disturb the jury's verdict and affirm his conviction. We also affirm his sentence for murder. Because the judge incorrectly merged the possession of a handgun without a license count and failed to merge the possession of a handgun for an unlawful purpose, we are compelled to remand this matter for resentencing of those counts.

I.

We glean the following facts from the record. At approximately 9:20 p.m. on November 27, 2016, Jersey City Police Department (JCPD) officers Luis Rentas and Patrick Canfield responded to reports of shots fired on Claremont

2                                                                  A-2664-18

Avenue. Rashay Washington was found in a pool of his own blood on a stoop, shot over a dozen times, but still conscious and alert.

Rentas asked Washington who shot him, and Washington replied, "Davon Cooper and Aaron Enix." Rentas asked Washington again who had shot him, and this time Washington responded, "[t]hose mother f**kers, Aaron Enix and Davon Cooper shot me." Rentas wrote the names down in his notepad. Canfield was beside Rentas and listed Cooper and Enix in his subsequent report as the men Washington claimed shot him. According to Canfield, in addition to identifying his attackers by name, Washington also told him that "the suspects ran south on Clerk Street." Rentas corroborated this account of Washington's statement describing the direction his assailants took immediately after the shooting.

A pedestrian also reported seeing two men wearing burgundy clothing fleeing the scene on foot down Clerk Street. Officers Terrell Darby and Raymond Guadalupe proceeded in that direction and came across two men wearing burgundy, apprehending them within two minutes of the police transmission of 'shots fired" made at 9:22 p.m. The two men turned out to be Davon Cooper and Aaron Enix. Darby described Enix as wearing a burgundy top and burgundy pants, and Cooper as wearing a black hat, a burgundy top with

3

black shoulders, and black Adidas style pants. The clothing described by Darby matched the clothing worn by the assailants depicted in the video footage taken by surveillance cameras in the area of the crime scene.

Later that night, police conducted an investigatory canvas of the area between where defendants were apprehended and where the victim was shot. Sergeant Douglas Paretti recovered sixteen spent shell casings and six projectiles. Officer Patrick Egan, canvassing through backyards and alleyways in the neighborhood, heard rustling in a nearby yard and went to investigate. Two handguns were found on the south side of Clerk Street—a semi-automatic Ruger and a semi-automatic Sig Sauer. Both weapons were found with their slides "locked back" indicating that they had been fired until their magazines were empty.

Washington was treated at the scene by paramedics and transported to Jersey City Medical Center. His vital signs dropped while in the ambulance and he faded in and out of consciousness. The medical records show Washington was shot sixteen times, endured multiple surgeries in the immediate aftermath of the shooting, contracted pneumonia, and died on December 12, 2016, one day after a final surgery. The medical examiner conducted an autopsy and ruled the

4

cause of death to be multiple gunshot wounds and the manner of death to be homicide.

A Hudson County Grand Jury returned an indictment charging Cooper and Enix, with first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a) (count 1); first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count 2); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (counts 3 and 4); and second-degree possession of a handgun without a license, N.J.S.A. 2C:39-5(b)(1) (counts 5 and 6).

Prior to trial, the State moved to admit the victim's statement to Rentas identifying Cooper and Enix as his assailants. Rentas testified at the motion hearing that Washington said, "those mother f**kers, Davon Cooper and Aaron Enix shot me." Rentas also testified that Washington said that he "didn't want to die." Canfield was standing beside Rentas when Washington said this. Washington's statement that he did not want to die was not included in Canfield's report. Nor did Rentas write down this statement on the notepad where he wrote down Cooper and Enix's names. Rentas reviewed the report and opted not to supplement it. Nor did the paramedic recall any statement from Washington to that effect. In fact, defense counsel was able to adduce that Rentas only

mentioned Washington's fear of death after a detective taught him about dying declarations after the shooting and prior to testifying.

The trial court issued a comprehensive memorandum opinion admitting Washington's statements identifying Cooper and Enix as dying declarations. The court noted that Washington "was suffering from multiple grievous injuries." The paramedic counted sixteen gunshot wounds and considered the victim to be in life-threatening condition. The court found the motion record

> clearly indicate[d] that Mr. Washington believed his death was imminent. Mr. Washington was in critical condition due to loss of blood from [sixteen] bullet wounds, and stated that he did not want to die. Based on the severity of his injuries, and Mr. Washington's statement that he did not want to die, a reasonable inference can be drawn that Mr. Washington believed his death was imminent. Mr. Washington made the identification to Officer Rentas three times, and there are no facts to indicate this statement was not voluntarily made.

Cooper and Enix were tried together. After Washington's dying declaration was admitted, the State showed surveillance footage that police pieced together from three different vantage points. The footage showed the shooting, and two individuals running down Claremont Avenue and then down Clerk Street.

A-2664-18

The State called JCPD Sergeant Gilberto Vega to authenticate the recordings. Vega was not present on the scene the night of the shooting, but narrated portions of the footage shown to the jury. The jury asked for the footage to be replayed multiple times during deliberations.

After deliberating for more than a day, the jury returned its verdict. The jury found Enix guilty of murder and counts four and six (the weapons charges), but acquitted him of conspiracy to commit murder. The jury acquitted Cooper of murder and conspiracy to commit murder but found him guilty of counts three and five.[1]

A few days after the verdict was returned, one of the deliberating jurors (the juror) contacted Enix's attorney and stated "I don't agree with the verdict" several times. Counsel recounted the telephone call from the juror, which was both brief and short on details, and noted the juror "specifically did not indicate any outside influence." Upon realizing that he was speaking to a juror, counsel stopped the conversation, suggested the juror contact the judge, and contacted the State, the court, and co-counsel to apprise them of the issue. The juror then

---

[1] We affirmed Cooper's conviction on counts three and five but reversed the merger of the unlawful possession of a handgun into the possession of a handgun for an unlawful purpose and remanded for resentencing. State v. Cooper, No. A-2695-18 (App. Div. Apr. 7, 2021). Cooper did not challenge the admission of the dying declarations in his appeal. Id. (slip op. at 8).

A-2664-18

called the court and left a message with the judge's secretary. He indicated that he was "not happy with the verdict" and wished to speak to the judge to know what could be done about it. The judge convened a hearing to discuss the issue.

The State did not believe the incident warranted any further action. Neither defense attorney sought a remedy. The judge concluded that there was no legal or factual basis to call back and interview the juror about the deliberative process, noting there was "not even a hint" of misconduct.

Enix was sentenced on January 4, 2019. The judge found the following aggravating factors: one (nature and circumstances of the offense), N.J.S.A. 2C:44-1(a)(1), as to count two only; three (risk of reoffending), N.J.S.A. 2C:44-1(a)(3); six (prior criminal record and seriousness of offenses), N.J.S.A. 2C:44-1(a)(6); and nine (need for deterring defendant and others), N.J.S.A. 2C:44-1(a)(9). The judge found no mitigating factors and that the aggravating factors substantially outweighed the non-existent mitigating factors.

For the murder, Enix was sentenced to a fifty-five-year term, subject to a fifty-year period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count four, he was sentenced to a concurrent ten-year term, subject to a five-year period of parole ineligibility under the Graves Act,

N.J.S.A. 2C:43-6(c).  Both terms run concurrently to his sentence on another indictment.  Count six was merged into count four.  This appeal followed.

Appellant raises the following points for consideration:

POINT ONE

RASHAY WASHINGTON'S STATEMENT IDENTIFYING HIS ATTACKERS DID NOT QUALIFY AS AN ADMISSIBLE DYING DECLARATION.

POINT TWO

THE NARRATION OF SURVEILLANCE VIDEO BY SERGEANT VEGA CONSTITUTED IMPROPER OPINION TESTIMONY.

POINT THREE

THE TRIAL COURT ERRED BY FAILING TO CONDUCT A POST-VERDICT HEARING TO INVESTIGATE THE DETAILS OF THE ALLEGED JURY MISCONDUCT REPORTED BY JUROR NO. 14.

POINT FOUR

DEFENDANT'S SENTENCE OF FIFTY-FIVE YEARS, SUBJECT TO THE NO EARLY RELEASE ACT IS MANIFESTLY EXCESSIVE, AND THE CONVICTION FOR POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE MUST MERGE INTO THE MURDER COUNT.

## II.

We first address Enix's contention that the trial court erred by admitting Washington's statements to police as dying declarations. Enix argues that Washington's statements were inadmissible hearsay that violated his right to confrontation. We conclude that Washington's identification of Enix and Cooper as the shooters qualified as dying declarations admissible under N.J.R.E. 804(b)(2) and an exception to the right of confrontation's proscription against the use of testimonial statements in a criminal case.

The trial judge also concluded that admission of Washington's statements did not violate Enix's right to confront his accuser because the sole purpose of eliciting the identification was to meet an "ongoing emergency." Identifying the shooters was imperative to neutralize the threat to the community. Therefore, no confrontation clause violation occurred, and the dying declaration to the hearsay rule applied.

Appellate review of a trial court's evidentiary determinations is limited to examining the decision for abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). In doing so, the reviewing court may not "create anew the record on which the trial court's admissibility determination was based." Ibid. Generally, evidentiary determinations are given considerable latitude and will not be

10

disturbed unless the decision "was so wide of the mark that a manifest denial of justice resulted." State v. Kuropchak, 221 N.J. 368, 385-86 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Generally, hearsay statements are inadmissible as evidence. N.J.R.E. 802. Certain exceptions to the hearsay rule apply, however, if a declarant is unavailable. N.J.R.E. 804. One such exception is an unavailable declarant's statement made "under belief of imminent death"—commonly referred to as a "dying declaration." N.J.R.E. 804(b)(2). Under this exception, "a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." Ibid. "Despair of recovery may indeed be gathered from the circumstances if the facts support the inference." State v. Prall, 231 N.J. 567, 585 (2018) (quoting Shepard v. United States, 290 U.S. 96, 100 (1933)).

In assessing admission, courts look to:

> all the attendant circumstances . . . including [1] the weapon which wounded him, [2] the nature and extent of his injuries, [3] his physical condition, [4] his conduct, and [5] what was said to and by him. Whether the attendant facts and circumstances of the case warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind and the

> credibility, interpretation and weight to be given his statement are for the jury under proper instructions.
>
> [State v. Hegel, 113 N.J. Super. 193, 201 (App. Div. 1971) (citation omitted) (quoting Commonwealth v. Knable, 85 A.2d 114, 117 (Pa. 1952)).]

Here, Washington clearly knew he was seriously injured, in critical condition, and believed in the imminence of his death, as evidenced by his statement that he did not want to die. He had been shot sixteen times and was bleeding profusely. The gravity of his wounds was obvious. No one had to tell him that that he was seriously wounded or facing death at the time the statements were made. Washington's vital signs quickly deteriorated, and he lapsed into and out of consciousness while inside the ambulance. He died shortly thereafter. By any measure, his death was imminent when he spoke to police.

When police asked Washington who shot him shortly after the shooting, he voluntarily stated without hesitation that Enix and Cooper had shot him. There is no indication that his statements were not made in good faith. Enix has not asserted that Washington had a reason to fabricate the identifications. Given these circumstances, Washington's statements clearly qualified as dying declarations admissible under N.J.R.E. 804(b)(2).

We next consider whether the admission of Washington's statements violated the Confrontation Clause. The right of a criminal defendant to confront

12

witnesses against him is well grounded in Constitutional and New Jersey Law. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "The Confrontation Clause generally prohibits the use of out-of-court testimonial statements by an absent witness who has not been subject to cross-examination." State v. Roach, 219 N.J. 58, 85 (2014) (Albin, J. dissenting) (citing Crawford v. Washington, 541 U.S. 36, 51 (2004)). The Confrontation Clause serves "'to ensure the reliability of the evidence [admitted] against a criminal defendant by subjecting it to rigorous testing' in an adversarial proceeding." State v. Miller, 170 N.J. 417, 425 (2002) (quoting Maryland v. Craig, 497 U.S. 836, 845 (1990)).

Critical to this rule, however, is the difference between testimonial and nontestimonial statements. Testimonial statements are those made during an interrogation with the "primary purpose . . . to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). Conversely, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Ibid. Only testimonial statements trigger a defendant's right to confrontation. Id. at 821.

In a scenario similar to this case, the United States Supreme Court held that a victim's dying declaration to police identifying an assailant was non-testimonial because it was obtained to enable police to meet an ongoing emergency. Michigan v. Bryant, 562 U.S. 344, 378 (2011). Here, at the time Washington identified the shooters, the police were in the midst of an ongoing emergency—the shooters were still at large and believed to be armed and dangerous. The police were obliged to address the ongoing emergency and question Washington, who had been shot multiple times but was still conscious and alert, to learn if he could identify his assailants. Consequently, Washington's statements were nontestimonial. Therefore, his identification of defendants did not implicate defendants' rights to confrontation. Ibid.; Davis, 547 U.S. at 821.

In addition, "the right to confrontation has been interpreted to allow hearsay evidence to be admitted against a defendant under certain circumstances." Miller, 170 N.J. at 426. A defendant's right to confrontation is not violated if evidence is admitted where a "'firmly rooted' hearsay exception or 'particularized guarantees of trustworthiness' assure its reliability." Ibid. (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)). Washington's statements were properly admitted as dying declarations.

A-2664-18

Pursuant to the ongoing emergency doctrine and the longstanding hearsay exception for dying declarations, which remains viable even post-<u>Crawford</u>, Enix's right of confrontation was not violated. The court did not abuse its discretion in admitting Washington's statements

III.

Enix further argues that Vega's narration of the surveillance video constituted improper lay opinion testimony that invaded the province of the jury. The State responds that Vega provided the jury with observations and context based on his personal knowledge that could not have been drawn absent the narration.

Importantly, Enix did not object to Vega's narration at trial. Accordingly, we review for plain error. Under that standard, an error "shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." <u>R.</u> 2:10-2. The defendant who failed to raise an objection at trial "bears the burden of establishing that the trial court's actions constituted plain error[.]" <u>State v. Santamaria</u>, 236 N.J. 390, 404-05 (2019) (quoting <u>State v. Ross</u>, 229 N.J. 389, 407 (2017)). To carry this burden, the defendant must establish "a reasonable doubt [that] . . . the jury came to a result

15

that it otherwise might not have reached" absent the alleged error. State v. R.K., 220 N.J. 444, 456 (2015).

A lay witness may testify in the form of an opinion or inference only "if it (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. "Perception" testimony is limited to the direct observations and may not rest on otherwise inadmissible hearsay. State v. McLean, 205 N.J. 438, 457 (2011).

In State v. Singh, a detective was called as a lay witness to describe what was occurring on surveillance footage. 245 N.J. 1, 7-10 (2021). During his testimony, the detective "referred to 'the defendant' only twice in narrating the surveillance footage. All other references to defendant were as 'the suspect,' 'a male,' 'a person,' or 'the individual.'" Id. at 18. Defense counsel did not object to the detective's references to "defendant" at trial. Ibid. Although the Court found that the references to the individual in the surveillance footage as "defendant" were error, it concluded "that they were not so prejudicial as to meet the plain error standard[,]" because "they were not 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2).

Also at issue in Singh was the police officer's testimony that the shoes the man in the footage was wearing appeared to be similar to the shoes the defendant was wearing when he was arrested the night of the robbery. Id. at 24-26. Over defense counsel's objection, the detective was permitted to describe the shoes seen on the video and say that they were similar to what defendant was wearing when he was arrested. Id. at 25.

Holding that N.J.R.E. 701 "does not require the lay witness to offer something that the jury does not possess," the Court concluded that the detective's observation of the similarities between the shoes on the footage and what defendant was wearing when arrested was based on his firsthand perception and was helpful to the jury. Id. at 19-20. The Court noted:

> Simply because the jury may have been able to evaluate whether the sneakers were similar to those in the video does not mean that Detective Quesada's testimony was unhelpful." Nor does it mean that Detective Quesada's testimony usurped the jury's role in comparing the sneakers. Indeed, the jury was free to discredit Detective Quesada's testimony and find the sneakers in evidence were dissimilar to those on the surveillance video.
>
> [Id. at 20.]

The Court found that unlike in McLean, the detective made no

> ultimate determination. He never stated that the sneakers seen in the surveillance footage were the

A-2664-18

sneakers he saw [the] defendant wearing that night. He testified to their similarity. Under N.J.R.E. 701, such testimony was proper because it was rationally based on his perceptions and assisted the jury in determining the robber's identity.

[Ibid.]

The Court found no abuse of discretion in the admission of the detective's testimony about the sneakers. Ibid.

Applying those principles to this matter, we find that Vega's narration of the surveillance footage was proper lay opinion testimony. Vega did not refer to the men on the surveillance video as "defendant." He refers to them as "males," "suspects," and "actors." In addition, Vega's testimony assisted the jury by providing context to wat was shown on the surveillance footage.

The testimony at issue is as follows:

Q: All right. Sergeant Vega, what did we just observe on that video based on the video you recovered?

A: We observed two males shooting into the body of a male that was standing in front of 62 Claremont.

Q: And how were you able to see that that was a shooting?

A: From just observing the video. I could see the gun flash, . . . otherwise known as the muzzle flash, and --

Q: And the two --

A:     -- from my training and experience.

Q:     And the two males that you observed, where did they run?

A:     They ran from that location, across the intersection of Claremont, and then south on Clerk.

Q:     The video at 78 Clerk Street, what was significant regarding that video versus the video that you observed here?

A:     It's significant, because 78 Clerk is in proximity to the incident location . . . where the shooting just occurred, and it is in the path of where the two actors ran.

Q:     And that's why you obtained this video and that video; is that correct?

A:     Correct, sir.

Vega's testimony contextualized the location shown in the video by providing two addresses and describing their location in relation to each other. This information was helpful to the jury in determining the probative value to ascribe to the video and was based on his own knowledge of the crime scene and surrounding area. Notably, Vega did not indicate a belief that either defendant was shown on the footage, nor did he provide any other identifying details that might sway the jury. It was precisely the type of "ordinary fact-based recitation" that McLean held was permissible. 205 N.J. at 460. Further, the testimony is

within the bounds set by Singh. Vega did not make any ultimate determinations, but rather provided context which the jury could not glean solely from the video. For these reasons, we discern no plain error.

IV.

We next address defendant's argument that the trial court erred by failing to conduct a post-verdict hearing regarding the complaints of alleged jury misconduct made by the juror. Enix contends the court could not determine whether the good cause standard of Rule 1:16-1 had been met without hearing the details of the juror's allegations. We disagree.

Defense counsel did not request a hearing at which the juror could be questioned. We therefore review for plain error.

This court has long recognized the strong public interest underpinning the need to protect the confidentiality of the jury's deliberative process. State v. Young, 181 N.J. Super. 463, 468 (App. Div. 1981). "A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out." State v. LaFera, 42 N.J. 97, 106 (1964). Protecting the jury's deliberative process during and after the trial is an indispensable part of creating an environment that allows individual jurors to express their views of the evidence freely and without fear of retribution. Ibid.

20

Pursuant to Rule 1:16-1, "[e]xcept by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney, interview, examine, or question any grand or petit juror with respect to any matter relating to the case." "Calling back jurors for interrogation after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing that a litigant may have been harmed by jury misconduct." State v. Athorn, 46 N.J. 247, 250 (1966). "That exacting standard balances the litigant's interest in ensuring an impartial jury with the importance of keeping deliberations secret." Davis v. Husain, 220 N.J. 270, 279 (2014). Otherwise, "an open invitation would be extended to any disgruntled juror who might choose to destroy a verdict to which he previously assented." Athorn, 46 N.J. at 250.

"Similarly, a judge's ability to inquire of jurors after trial is limited except where Rule 1:16-1 provides a good-cause basis to do so . . . ." Id. at 280. "Inquiring into any juror's thought process is a significant intrusion into the deliberative process." Ibid.

Good cause is shown when a juror is given "information . . . extraneous to the issues that the jury is deciding, and that would be sufficiently prejudicial to warrant a new trial if such information were considered by the jury." Id. at 286

(citing State v. Kociolek, 20 N.J. 92, 100 (1955)).  Good cause may also be shown by a manifestation of "racial or religious bigotry" in a jury's deliberations. State v. Koedatich, 112 N.J. 225, 288 (1988) (citing State v. Levitt, 36 N.J. 266 (1961)).  Good cause triggering post-verdict voir dire occurs in "exceedingly few" instances.  State v. LaFera, 42 N.J. 97, 107 (1964).

Here, the juror reached out to Enix's trial counsel, and then the trial judge's chambers, to express his "dissatisfaction with the verdict that was rendered." While he left a message with the judge's secretary, the juror managed to speak to Enix's attorney for about thirty seconds.  Before Enix's attorney realized he was speaking to a juror, the juror "basically went through a dissertation of what took place in the jury room."  While the juror was able to indicate in that short call that "one juror was pregnant, and another juror had poison ivy," there was no indication that anything improper occurred during deliberations.  In fact, when asked by Enix's counsel why he voted guilty when polled, the juror said "well, that's what I felt at the time."

Critically, the juror provided no indication whatsoever that outside information was considered by the jurors, that racial prejudice factored into the jury's deliberations, or that any other impropriety occurred.  He provided no specifics of any juror misconduct and did not allege the jury was infected by

22

racial animus. Moreover, while the juror was the only African-American on a jury where two African-Americans were tried for killing another African-American, the juror agreed to convict Enix. Speculating that racial prejudice infected the jury is simply too attenuated a supposition to meet the good cause standard under Rule 1:16-1. Our case law requires more than an unfounded suspicion, or one based on more than a tangential inference. While racial animus can play a part in jury deliberations, in this instance there is no indication that it did. The mere unsubstantiated possibility of racial animus does not trigger a post-verdict juror voir dire under Rule 1:16-1. Accordingly, we discern no error, let alone plain error. The trial judge correctly concluded that the statements made by the juror did not meet this standard.[2]

## V.

Lastly, we address Enix's sentencing arguments. Enix first contends that his fifty-five-year NERA term is manifestly excessive. We are unpersuaded.

We are guided by well-established legal principles. Appellate courts review sentencing determinations deferentially. State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for that of the

---

[2] We reached the same conclusion in Cooper, (slip op. at 16).

A-2664-18

sentencing court. Ibid. (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)).

Instead, we will affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [Id. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

To facilitate appellate review, the sentencing court must "state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting sentence[.]" R. 3:21-4(h); Fuentes, 217 N.J. at 73; see also N.J.S.A. 2C:43-2(e) (requiring the sentencing court to state the "factual basis supporting its findings of particular aggravating or mitigating factors affecting sentence.").

Enix argues that the application of aggravating factor one constituted impermissible double counting. Aggravating factor one requires consideration of "[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner[.]" N.J.S.A. 2C:44-1(a)(1). The court characterized Washington's killing as "a callous, depraved, heinous

murder" noting that when Washington "stumbled and fell," Enix did not stop, he "kept firing" . . . "to "make sure" Washington died. Enix asserts that this finding amounted to double counting since Washington's death was an element of the murder.

"[A]ggravating factor one must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Fuentes, 217 N.J. at 63. See also O'Donnell, 117 N.J. at 217-18 (factor one applied in a manslaughter case because the defendant intentionally inflicted pain and suffering in addition to causing death); State v. Locane, 454 N.J. Super. 98, 123-24 (App. Div. 2018) (the trial court erred in failing to find factor one in relation to a vehicular homicide where the defendant's reckless driving went beyond that required to prove the crime); State v. Soto, 340 N.J. Super. 47, 71-72 (App. Div. 2001) (factor one applied in an aggravated manslaughter and felony murder case were the defendant brutally and viciously attacked the victim); State v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992) (in an aggravated assault case, factor one applied based on the victim's serious and excessive injuries).

Enix further argues that the court's determination that the murder was heinous and depraved is not supported by the facts. Crimes omitted with extreme brutality are considered heinous and depraved. Fuentes, 217 N.J. at 75.

25

The homicide must involve more than a fatal shooting. Soto, 340 N.J. Super. at 71-72.

Here, Washington was shot sixteen times while he was still alive and conscious. Washington was still conscious when police arrived and when placed in the ambulance. He continued to experience pain until he lapsed into unconsciousness in the ambulance as his vital signs plummeted enroute to the hospital. We discern no abuse of discretion in considering the shooting sequence to be heinous and depraved. This intentional infliction of pain amply supported finding aggravating factor one.

Enix also contends that the trial court did not adequately consider the real time consequences of the fifty-five-year NERA term, which will require Enix to serve almost forty-seven years before becoming eligible for parole. We are unpersuaded.

The sentencing range for knowing or purposeful murder is thirty years to life imprisonment with a minimum thirty-year period of parole ineligibility. N.J.S.A. 2C:11-3(b)(1). Because NERA applies to murder, N.J.S.A. 2C:43-7.2(d)(1), Enix will be approximately seventy years old before becoming eligible for parole.

This was not Enix's first involvement with the criminal justice system. He was adjudicated delinquent as a juvenile on three occasions, including aggravated assault, N.J.S.A. 2C:12-1(b)(5), and was incarcerated for nine months. As an adult, he had four other criminal convictions, including a second-degree weapons offense. The court found aggravating factors one, three, six, and nine and no mitigating factors. The record fully supports those findings. On appeal, Enix only attacks aggravating factor one and does not contend that any mitigating factors applied. The record supports the finding that the aggravating factors substantially outweighed the non-existent mitigating factors.

"Whether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors." State v. Case, 220 N.J. 49, 64 (citing Fuentes, 217 N.J. at 72). "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." Id. at 64-65 (alteration in original) (quoting State v. Natale, 184 N.J. 458, 488 (2005)). Here, the aggravating factors substantially outweighed the non-existent mitigating factors. Even so, Enix was not sentenced to the maximum. Moreover, he was sentenced to concurrent terms and his sentence runs concurrently to the sentence imposed on another indictment. We do not

27

find the sentence imposed on the murder count to be manifestly excessive or unduly punitive. Nor does it shock our judicial conscience.

That said, the parties acknowledge that Enix's conviction for possession of a weapon for an unlawful purpose must be merged into the murder count. We agree. The State proffered no unlawful purpose for Enix's possession of the handgun other than to murder Washington. Accordingly, it should have been merged into the murder count. See State v. Tate, 216 N.J. 300, 307 (2013) (merging a conviction of possession of a weapon for an unlawful purpose with a conviction of aggravated manslaughter). The court may not impose sentence on a merged offense. State v. Trotman, 366 N.J. Super. 226, 237 (App. Div. 2004). We reverse Enix's sentence on count four and remand for merger of that count into count two.

In turn, the State argues that the court erred by merging Enix's conviction for possession of a weapon without a permit conviction into count four. We agree. "Because the gravamen of unlawful possession of a handgun is possessing it without a permit, it does not merge with a conviction for a substantive offense committed with the weapon." State v. Deluca, 325 N.J. Super. 376, 392 (App. Div. 1999). Count six should not have been merged into count four. See State v. Bowser, 297 N.J. Super. 588, 592 n.1 (App. Div. 1997)

("A conviction for unlawful possession of a handgun should not merge with robbery while armed with the same gun."). This merger error renders the sentence illegal. State v. Romero, 191 N.J. 59, 80 (2007). Although the State did not file a cross-appeal, "a reviewing court is not free to ignore an illegal sentence[,]" State v. Moore, 377 N.J. Super. 445, 450 (App. Div. 2005) (citing State v. Flores, 228 N.J. Super. 586, 594 (App. Div. 1988)), and should correct it, State v. Tavares, 286 N.J. Super. 610, 617 (App. Div. 1996). On remand, the trial court shall resentence Enix on count six.

In sum, we affirm the jury's verdict and Enix's sentence for murder, remand for resentencing on count six, reverse the sentence on count four, and remand for merger of count four into count two.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION